**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

ENVIRONMENTAL DEFENSE FUND,

UNION OF CONCERNED SCIENTISTS,

                  *Plaintiffs*,

    v.

CHRISTOPHER WRIGHT, in his official capacity
as Secretary of Energy,

UNITED STATES DEPARTMENT OF ENERGY,

LEE ZELDIN, in his official capacity as
Administrator of the U.S. Environmental Protection
Agency,

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY,

CLIMATE WORKING GROUP,

                  *Defendants*.

Case No. _____

## COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND MANDAMUS RELIEF

1.      The causes of climate change and the resulting harms to millions of people are among the most important scientific issues that federal policymakers have ever confronted. The federal government's science-based regulation of greenhouse gas emissions is vital to protecting and advancing public health, a flourishing economy, a healthy environment, and the livability of our planet for generations to come.

2.      In 2009, faced with a mountain of scientific data on the human causes and devastating effects of climate change, the U.S. Environmental Protection Agency (EPA) formally determined that greenhouse gases threaten the public health and welfare of the American people,

and that emissions from motor vehicles and engines contribute to the greenhouse gas pollution that threatens public health and welfare (the "Endangerment Finding"). The Endangerment Finding reflects the overwhelming consensus of the scientific community—conclusions that major American and international scientific bodies and the federal government have reaffirmed time and again since the Endangerment Finding was first issued, including during the first Trump administration. This science-based assessment of the causes of climate change and the harms that it is already inflicting on the American people, which EPA issued after a transparent rulemaking process with a full opportunity for public comment, has underpinned EPA actions to reduce climate-disrupting pollution from new cars and trucks and other sources.

3.    But now, in the span of a few months, the U.S. Department of Energy (DOE) and EPA have sought to manufacture a basis to reject this overwhelming scientific consensus. And they have done so through a plan hatched and carried out in secret. In March 2025, shortly after being confirmed to office, Secretary of Energy Christopher Wright quietly arranged for five hand-picked skeptics of the effects of climate change to form a Climate Working Group. Wright tasked the group with preparing a report that would provide "balance" against the consensus views of climate scientists[1] and "cut against the prevailing narrative that climate change is an existential threat."[2]

4.    The Climate Working Group worked in secret for months to produce a report for DOE and EPA that would provide justification for their predetermined goal of rescinding the Endangerment Finding. In May, unbeknownst to the public, the group transmitted its report to EPA, and EPA then relied extensively on the report in preparing its proposal to rescind the

---

[1] Climate Working Group, *A Critical Review of Impacts of Greenhouse Gas Emissions* at viii (July 23, 2025), https://perma.cc/Y6QJ-QYQR.
[2] Travis Fisher, *Why I Helped Organize the Department of Energy's Climate Report*, CATO at Liberty (Aug. 6, 2025, 10:25 AM), https://perma.cc/CQ87-WCYF.

Endangerment Finding. It was not until the same day that EPA released that proposal, July 29, that the existence and work of the group was made public. Secrecy was so important to Defendants that when the New York Times asked one of the group's members in early July about his role at DOE, the member obscured his work for the group and simply said that he is an "unpaid person who's available to them if they need it."[3]

5.      But federal law does not permit agencies to create or rely on such secret, unaccountable groups when engaged in policymaking. In the Federal Advisory Committee Act (FACA), Congress mandated transparency in the establishment and operation of any federal advisory committee, including by requiring that the group's formation be promptly disclosed and that its meetings, emails, and other records be open to the public. Here, Defendants did not disclose the Climate Working Group's existence until months after it began working, and not a single meeting or record has been made public other than the group's report. Defendants also violated FACA's prohibition on stacking an advisory committee with adherents of only one point of view; the Climate Working Group's members were all chosen for their skepticism of climate science, and the group does not have a single member that agrees with the consensus of the overwhelming majority of the scientific community on the effects of climate change.

6.      The Environmental Defense Fund and the Union of Concerned Scientists bring this action to enjoin Defendants' flagrant violations of FACA, to bring transparency to the Climate Working Group's work to date as the law requires, and to compel Defendants to follow the law if they wish to rely on outside scientific advisors to justify their actions going forward. If DOE and EPA wish to establish an advisory committee for the enormously consequential

---

[3] Maxine Joselow, *Trump Hires Scientists Who Doubt the Consensus on Climate Change*, N.Y. Times (July 8, 2025), https://www.nytimes.com/2025/07/08/climate/trump-climate-energy-department.html.

purposes for which they have put the Climate Working Group to use, they must comply with the rules that Congress has prescribed.

## PARTIES

7.      Plaintiff Environmental Defense Fund (EDF) is a non-profit organization that is guided by science and working to stabilize the climate, strengthen the ability of people and nature to thrive, and support people's health. EDF is dedicated to finding practical and durable solutions to pressing public health and environmental problems through collaborations with business and communities and working with policymakers. EDF has offices and members throughout the United States.

8.      EDF engages in extensive, daily efforts to inform the public about matters affecting public health, environmental and energy policy, as well as about climate change science and the human health impacts of pollution. EDF has multiple channels for distributing information to the public, including through direct communication with its more than three million members and supporters, press releases, blog posts, reports and analyses, scientific studies, and engagement on social media. EDF is frequently called upon to share its expertise on important public health and environmental issues in the popular media and in other public forums. EDF has long advocated for measures to protect people and communities from the harmful effects of air pollution and climate change.

9.      Plaintiff Union of Concerned Scientists (UCS) is a not-for-profit membership organization based in Cambridge, MA. UCS puts rigorous, independent science into action, developing solutions and advocating for a healthy, safe, and just future. UCS represents the interests of the scientific community in advancing science in public policy, and advocates for the

role of science and scientists in federal policymaking and in civil society, including fair representation in government and on federal advisory committees.

10.     Through the UCS Center for Science and Democracy, UCS works to highlight the role of impartial, best available science in solving the nation's most critical problems, and to strengthen the overall partnership between science and democracy. UCS also has a long-established Climate and Energy program working on climate science and solutions, and which advocates for policies at the federal, state, and international levels that help protect people, ecosystems, and the economy. UCS experts are widely relied-upon and communicate our work through multiple channels with the public, media, policymakers and others.

11.     Over 20,000 of UCS's 610,000 members are part of its Science Network, comprised of scientists that hold or are working toward advanced degrees in life, physical, mathematical, or social sciences; professionals with or working towards advanced degrees in medicine or public health; engineers; and people with expertise in science history or science policy.

12.     UCS members are part of the country's largest science advocacy network. UCS members have access to trainings, resources, publications, and networking opportunities. They have unique opportunities as science advocates to help advance evidence-based policy priorities via petitions, phone-banking, meeting with policymakers, public comments in the administrative record, speaking to the public and media about their research and analysis, and more.

13.     Defendant Christopher Wright is the Secretary of Energy and is sued in his official capacity.

14.     Defendant DOE is an agency of the United States government.

15.     Defendant Lee Zeldin is the Administrator of EPA and is sued in his official capacity.

16.     Defendant EPA is an agency of the United States government.

17.     Defendant Climate Working Group is an advisory committee established by DOE that drafted a report on the impacts of greenhouse gas emissions on the U.S. climate (the "CWG Report").

## JURISDICTION AND VENUE

18.     This court has subject-matter jurisdiction to adjudicate these claims because this action arises under the Constitution and laws of the United States, 28 U.S.C. § 1331; because Defendants are United States officials, 28 U.S.C. § 1356(a)(2); because Plaintiffs seek mandamus against United States officials, 28 U.S.C. § 1361; and because this case arises under the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. §§ 702, 704.

19.     This court may grant declaratory, injunctive, mandamus, and other relief pursuant to 28 U.S.C. §§ 1361, 2201-2202, 5 U.S.C. §§ 705, 706, and the court's inherent authority to enjoin Federal officials from acting unlawfully.

20.     Venue is appropriate in this district under 28 U.S.C. § 1391(e) because Plaintiff UCS resides in this district.

## FACTUAL AND LEGAL BACKGROUND

### EPA's 2009 Endangerment Finding

21.     In 2009, EPA issued the "Endangerment Finding," a determination that greenhouse gases in the atmosphere threaten the public health and welfare of current and future generations, and that emissions from motor vehicles and engines contribute to the greenhouse gas pollution that threatens public health and welfare. *See* Endangerment and Cause or

Contribute Finding for Greenhouse Gases Under Section 202(a) of the Clean Air Act, 74 Fed. Reg. 66,496 (Dec. 15, 2009).

22.    The EPA's 2009 Endangerment Finding was supported by an "ocean of evidence." *Coal. for Responsible Regul., Inc. v. EPA*, 684 F.3d 102, 123 (D.C. Cir. 2012), *cert. denied in relevant part sub nom. Chamber of Commerce v. EPA*, 571 U.S. 951 (2013). Following the Supreme Court's decision in *Massachusetts v. EPA*, 549 U.S. 497 (2007), which held that EPA has clear authority to regulate greenhouse gas pollution under the Clean Air Act, EPA embarked on a lengthy evaluation process that involved several rounds of public input— including over 380,000 comments and two public hearings, rigorous peer review, and an exhaustive investigation of contemporary climate science literature. *See* 74 Fed. Reg. at 66,500, 66,510. EPA's final finding rested on a vast body of rigorous, peer-reviewed scientific research confirming that greenhouse gas pollution is driving destructive changes in our climate that pose a grave and growing threat to Americans' health, security, and economic well-being.

23.    Over time, the scientific evidence supporting the Endangerment Finding has only become stronger. The interagency expert body charged by Congress with assessing the impacts of climate change on the United States—the U.S. Global Change Research Program—has issued a series of National Climate Assessments, most recently by the Trump Administration in 2018 and the Biden Administration in 2023. Each Assessment has been developed through a rigorous process involving peer review, public comment, and expert review by the National Academy of Sciences, Engineering, and Medicine. Those National Climate Assessments confirm that climate change resulting from greenhouse gas emissions is causing extensive and increasingly severe harms throughout the country, including stronger hurricanes with more intense flooding that can

damage property and harm people, and more frequent and intense heat waves that contribute to increased illnesses and medical emergencies.[4] Climate change from greenhouse gas emissions has increased dry conditions across the Western United States and helped to fuel wildfires that endanger homes and businesses, threaten basic services like electricity provision, and directly affect the health and lives of people.

24.     Since its issuance in 2009, the Endangerment Finding has provided support for various EPA actions to limit climate pollution from coal- and gas-fired power plants, new passenger cars and trucks as well as medium and heavy-duty freight trucks and buses, and the oil and gas industry. *See, e.g.*, Light-Duty Vehicle Greenhouse Gas Emission Standards and Corporate Average Fuel Economy Standards, 75 Fed. Reg. 25,324 (May 7, 2010).

25.     On his first day in office, President Trump signed an executive order directing the EPA Administrator to work with other agency heads to submit recommendations on the "legality and continuing applicability" of EPA's 2009 Endangerment Finding. *See* Executive Order 14154, *Unleashing American Energy*, § 6(f). That same executive order condemned what the President called "burdensome and ideologically motivated regulations" that have "impeded the development of" fossil fuels. *See id.* § 1.

26.     In March 2025, consistent with the President's direction, EPA Administrator Lee Zeldin announced EPA's intention to reconsider the Endangerment Finding.[5] The Administrator

---

[4] The government recently took down the website that hosted the most recent edition of the National Climate Assessment. *See* Rebecca Hersner, *The White House Took Down the Nation's Top Climate Report. You can Still Find It Here*, NPR (July 1, 2025), https://perma.cc/6386-CUGF. Archived versions of the report remain available through other sources. *See* Michelle Jewell, Southeast Climate Adaptation Science Center, *Access and Download National Climate Assessments Here* (July 14, 2025), https://perma.cc/GB3H-NXVD.
[5] EPA, *EPA Launches Biggest Deregulatory Action in U.S. History* (Mar. 12, 2025), https://perma.cc/VG77-VHE8.

called the announcement the "most consequential day of deregulation in U.S. history" that would "driv[e] a dagger straight into the heart of the climate change religion."[6]

***The Department of Energy Establishes the Climate Working Group***

27.     Because the overwhelming scientific consensus—and the federal government's own expert analyses and reports—demonstrate the lack of any scientific basis to reconsider the Endangerment Finding, the Administration decided to manufacture purported expert opinions upon which the Administration could rely.

28.     Specifically, in March 2025, Secretary of Energy Chris Wright secretly devised a plan to convene a "climate working group" of individuals from outside the government.[7] The express purpose of the group would be to issue a report that would "challenge the mainstream consensus"[8] and "cut against the prevailing narrative that climate change is an existential threat."[9] The existence and work of the group was not publicly disclosed until July 29, 2025, the same day that EPA released its notice of proposed rulemaking to rescind the Endangerment Finding.

29.     From the outset, Secretary Wright knew who he wanted to serve on the working group. The Secretary asked Travis Fisher, the director of energy and environmental policy studies at the Cato Institute, to assemble Drs. John Christy, Judith Curry, Steven Koonin, Ross McKitrick, and Roy Spencer, to serve as members of the working group. Wright personally called the members to ask them to serve on the working group.[10] All five of these individuals

---

[6] *Id.*
[7] Fisher, *supra* note 2.
[8] CWG Report at x.
[9] Fisher, *supra* note 2.
[10] Benjamin Storrow, *How Chris Wright Recruited a Team to Upend Climate Science*, E&E News (Aug. 11, 2025, 6:15 AM), https://perma.cc/TNJ5-J4M4.

have a history of questioning the impacts of human-caused greenhouse gas emissions on climate change, and asserting that leading scientific assessments have overstated the impacts of climate change on human health and welfare and that the costs of climate change mitigation exceed the benefits.

30.    Dr. Christy is well known for his questioning of established, peer-reviewed climate science and raising doubts about the extent to which human activity has caused global warming.[11] He has been linked in the past to the Heartland Institute, an advocacy group that frequently questions the scientific consensus on climate change.[12] In a 2007 editorial in the Wall Street Journal, Christy wrote that he "see[s] neither the developing catastrophe nor the smoking gun proving that human activity is to blame for most of the warming we see," a view that he acknowledged was out of step with a "majority" of his climate scientist colleagues.[13] In testimony to Congress on multiple occasions, Christy has argued that climate models should not be used for predicting future changes in climate or for policy decisions.[14]

31.    On July 8, 2025, it was reported that Christy was listed in DOE's internal registry as an "expert" assisting Secretary Wright. When asked by the New York Times in July about this role, Christy affirmatively obscured his work for the Climate Working Group, stating that he was an "unpaid person who's available to them if they need it."[15] Christy's role with the group was not publicly disclosed until the release of its report on July 29.

---

[11] Joselow, *supra* note 3.

[12] Andrew Zinin, *U.S. Energy Department Misrepresents Climate Science in New Report*, Phys.org (Aug. 1, 2025), https://perma.cc/V84A-3XZ7.

[13] John R. Christy, *My Nobel Moment*, Wall Street J., Nov. 1, 2007.

[14] Testimony of John. R. Chrisy before the U.S. House Committee on Science, Space & Technology, Mar. 29, 2017, https://perma.cc/RK39-69VN.

[15] Joselow, *supra* note 3.

32.    Dr. Curry founded a private weather forecasting company, Climate Forecast Applications Network, that provides paid consulting services to clients with interests in limiting the government's role in addressing climate change, such as oil companies, electric utilities, and natural gas energy traders. Like Christy, Curry has been linked to the Heartland Institute. She also hosts a blog, Climate Etc., which has been described as part of the climate change "denial blogosphere."[16] In a 2010 profile in Scientific American, Curry accused the Intergovernmental Panel on Climate Change, which most climate scientists view as representing the "consensus on climate science," of "corruption."[17] Curry's role on the Climate Working Group was not publicly disclosed until the release of the CWG Report on July 29.

33.    Dr. Koonin is a Senior Fellow at Stanford University's Hoover Institution and formerly served as a non-resident Senior Fellow at the American Enterprise Institute. Koonin previously worked for five years as the Chief Scientist for BP. In 2019, Koonin was reportedly one of the main drivers behind the effort at EPA to launch a "red-team, blue team" exercise to question broadly supported conclusions in climate science.[18] In 2021, Koonin published a book on climate change that was widely condemned for promoting climate denial, "cherry-pick[ing] and misrepresent[ing] outdated material to downplay the seriousness of the climate crisis."[19] On July 8, 2025, it was reported that Koonin was listed as a "special government employee" in DOE's internal registry. Koonin's role on the Climate Working Group was not publicly disclosed, however, until the release of the CWG Report on July 29. Koonin has stated that he is a personal friend of Secretary Wright.

---

[16] Riley E. Dunlap & Robert J. Brulle, *Climate Change and Society: Sociological Perspective* 318 (2015).

[17] Michael D. Lemonick, *Climate Heretic: Judith Curry Turns on Her Colleagues*, Scientific American (Nov. 1, 2010), https://perma.cc/2H2K-84PE.

[18] Joselow, *supra* note 3.

[19] Naomi Oreskes, *That 'Obama Scientist' Climate Skeptic You've Been Hearing About . . .* , Scientific American (June 1, 2021), https://perma.cc/FQA9-NX78.

34.     Dr. McKitrick is a senior fellow at the Fraser Institute, a Canadian libertarian think tank known for promoting skepticism about the benefits and effectiveness of climate regulations. McKitrick has several affiliations with organizations denying the consensus view on climate change, including serving on the academic advisory board of the Global Warming Foundation. McKitrick is also an endorser of the Cornwall Alliance's "An Evangelical Declaration on Global Warming," which denies that carbon dioxide is a pollutant and opposes climate mitigation policies. McKitrick's role on the Climate Working Group was not publicly disclosed until the release of the CWG Report on July 29.

35.     Dr. Spencer is a Principal Research Scientist at the University of Alabama in Huntsville. He is a long-time skeptic of the well-supported and assessed findings of climate science and is affiliated with several organizations promoting those views, including the Heartland Institute, the Heritage Foundation, and the Cornwall Alliance. In describing his participation on the Climate Working Group, Spencer stated, regarding climate change: "It's just not a 'crisis,' and nothing we see in severe weather has been tied to human greenhouse gas emissions."[20] Spencer has testified in support of fossil fuel companies in the past, such as his 2015 testimony before the Minnesota Public Utilities Commission on behalf of Peabody Energy, a coal company.[21] Spencer's role on the Climate Working Group was not publicly disclosed until the release of the CWG Report on July 29.

---

[20] Roy Spencer, The DOE Scientific Report Underpinning the EPA's Decision to Reconsider the 2009 Endangerment Finding (July 29, 2025), https://perma.cc/CY5X-N2CJ.

[21] John Abraham, *Peabody Coal's Contrarian Scientist Witnesses Lose Their Court Case*, The Guardian (May 2, 2016), https://www.theguardian.com/environment/climate-consensus-97-per-cent/2016/may/02/peabody-coals-contrarian-scientist-witnesses-lose-their-court-case.

36.    The members of the Climate Working Group have a history of working together to advance their views relating to climate change.[22] In 2017, when the then-EPA Administrator proposed the idea of pitting "climate contrarians" against their mainstream counterparts in a "red team, blue team" exercise, the Heartland Institute sent EPA a list of climate skeptics that included four of the report's authors—Christy, Curry, Koonin, and Spencer.[23] Dr. Spencer recently stated that Secretary Wright "asked who I would recommend for other authors of the report," and Wright "had on his list of potential contributors the others who now appear on the report with me."[24]

37.    All five authors are well known for holding "contrarian views on climate science that are out of step with the mainstream."[25] None of the members represents the overwhelming consensus view among climate scientists that human activities, "principally through emissions of greenhouse gases," have "unequivocally" caused global warming, that widespread and rapid changes in the atmosphere have occurred that are already affecting weather and climate extremes throughout the globe, that climate change is a threat to human well-being and planetary health, and that reductions in greenhouse gas emissions would lead to a discernible slowdown in global warming that would reduce projected losses and damages for humans and ecosystems.[26]

---

[22] Richard Banks, WBHM, *Alabama's John Christy May Be The Country's Best Known And Most Criticized Climate Change Skeptic* (Sept. 1, 2023), https://perma.cc/96DR-53H9 (noting that Dr. Christy reached his conclusions on climate change while working with Dr. Spencer); American Physical Society, Climate Change Statement Review Workshop, https://perma.cc/JU9Z-UTV2 (transcript of a forum coordinated by Dr. Koonin and featuring Dr. Christy and Dr. Curry to argue against consensus views of climate change).

[23] Storrow, *supra* note 10.

[24] Spencer, *supra* note 20.

[25] Paul Voosen, *Contrarian Climate Assessment From U.S. Government Draws Swift Pushback*, Science (July 30, 2025, 5:45 PM), https://www.science.org/content/article/contrarian-climate-assessment-u-s-government-draws-swift-pushback/.

[26] Intergovernmental Panel on Climate Change, *Climate Change 2023 Synthesis Report: Summary for Policymakers*, https://perma.cc/J7HH-9JD5.

38.     By April 2025, DOE had assembled the Climate Working Group, and it began working in secret on its report. Over the next two months, the group sought to rewrite decades of climate science research.

39.     On May 27, 2025, the working group submitted its report to Secretary Wright, and the report was contemporaneously sent to EPA. According to Curry, although the group completed the CWG Report in May, its publication "was delayed to coincide with the release of EPA's proposal" to rescind the Endangerment Finding.[27]

40.     On July 29, 2025, DOE published the CWG Report, titled *A Critical Review of Impacts of Greenhouse Gas Emissions on the U.S. Climate*.

41.     Secretary Wright wrote a foreword in the report. There, he confirmed that he "commissioned this report" to "provide clarity and balance," because he believes that "media coverage often distorts the science" of climate change.[28] He criticized the mainstream narrative that places too much blame on "hydrocarbon-based fuels" and acknowledged that the report's conclusions "differ in important ways from the mainstream narrative." *Id.* Although the report is labeled a draft, Wright concluded that "it faithfully reports the state of climate science today." *Id.*

42.     The CWG Report bears DOE's official seal, but the Preface explains that there was "no editorial oversight by the Secretary, the Department of Energy, or any other government personnel." *Id.* at x. Nothing in the report suggests that it was subject to a standard independent peer review.

43.     Committee member Curry explained that "each CWG author . . . approved this document on a line-by-line basis."[29] According to Curry, "[t]he CWG expects to expend

---

[27] Storrow, *supra* note 10.
[28] CWG Report at viii.
[29] Judith Curry, *New Climate Assessment Report from US DOE*, Climate Etc. (July 29, 2025), https://perma.cc/9YMR-D283.

considerable time responding to the comments that are submitted on the draft report," and she "assume[s] that the CWG will be charged with writing a revised, more comprehensive report that responds to the external comments."[30]

44.     In the CWG Report, the authors assert that DOE commissioned the report to advise the federal government on "climate science relevant for energy policymaking."

45.     Carrying out this mandate, CWG Report advises policymakers that "U.S. policy actions are expected to have undetectably small direct impacts on the global climate and any effects will emerge only with long delays." The report is replete with conclusions and advice aimed at policymakers, such as that the economic effects of carbon-dioxide-induced warming "are too small to justify aggressive abatement policy and that trying to 'stop' or cap global warming . . . would be worse than doing nothing."[31]

46.     The CWG Report also advises broadly that global warming is on balance more beneficial than harmful, that cold temperatures are the greater threat, and that extreme weather events are no worse than they have been historically.

47.     Climate scientists immediately denounced the report, noting that "[t]o say that [the report's] claims defy the consensus is an understatement."[32] Joellen Russell, an oceanographer at the University of Arizona, observed that the report "is basically designed to suppress science."[33]

48.     Multiple scientists objected that their work had been mischaracterized by the CWG Report. One such scientist is Ben Santer, who is a board member of Plaintiff UCS. Santer

---

[30] *Id.*

[31] CWG Report at 116.

[32] Jody Freeman, *Trump's EPA Proposes to End the U.S. Fight Against Climate Change*, L.A. Times (Aug. 5, 2025), https://perma.cc/9X9W-VQWK.

[33] Jeff Tollefson, *Outrage Over Trump Team's Climate Report Spurs Researchers to Fight Back*, Nature (Aug. 7, 2025), https://perma.cc/C82G-RXPZ.

noted that the report "fundamentally misrepresents" his 2023 paper, "Exceptional Stratospheric Contribution to Human Fingerprints on Atmospheric Temperature."[34] Dozens of other scientists are in the process of coordinating a response to the report, which they say "misrepresents decades of climate science."[35]

49.    On August 1, 2025, DOE published a Notice of Availability of the CWG Report. *See* 90 Fed. Reg. 36,150. DOE has allowed members of the public only thirty-two days to comment on the report. The comment period will close on September 2, 2025.

50.    DOE has already highlighted the CWG Report's advice on its website. DOE states: "Among the key findings, the report concludes that carbon dioxide ($CO2$)-induced warming appears to be less damaging economically than commonly believed, and that aggressive mitigation strategies could be more harmful than beneficial. Additionally, the report finds that U.S. policy actions are expected to have undetectably small direct impacts on the global climate and any effects will emerge only with long delays."[36]

***EPA Relies on the CWG Report for Its Reconsideration of the Endangerment Finding and the Vehicle Emission Standards***

51.    On July 29, 2025, EPA issued a notice of proposed rulemaking to rescind the Endangerment Finding and all light-, medium-, and heavy-duty vehicle and engine greenhouse gas emission standards. *See* U.S. EPA, Proposed Rule: *Reconsideration of 2009 Endangerment Finding and Greenhouse Gas Vehicle Standards*, 90 Fed. Reg. 36,288 (Aug. 1, 2025). EPA

---

[34]Molly Taft, Scientists Say New Government Climate Report Twists Their Work, Wired (July 30, 2025, 4:31 pm), https://perma.cc/5HEV-QNHU.
[35]Tollefson, *supra* note 33.
[36] U.S. Dep't of Energy, Climate, https://www.energy.gov/topics/climate.

Administrator Lee Zeldin boasted that the proposal "would, if finalized, amount to the largest deregulatory action in the history of the United States."[37]

52.    In the proposed rule's Executive Summary, EPA states that it "reviewed and relied upon" the CWG Report "in formulating" its proposal. *See* 90 Fed. Reg. at 36,292. The proposed rule further states that the EPA Administrator personally "received and evaluated the draft report submitted by the U.S. Department of Energy (DOE) Climate Working Group (CWG)."

53.    EPA relies on the CWG Report extensively throughout the proposed rule, citing it a total of 22 times. EPA relies upon the report for each of the central assertions in the proposed rule's "Climate Science Discussion," including for the propositions that: "reducing GHG emissions from all vehicles and engines in the United States to zero would not have a scientifically measurable impact on GHG emission concentrations or global warming potential"; "empirical data suggest that actual GHG emission concentration increase and corresponding warming trends through 2025 have tracked the IPCC's more optimistic scenarios"; "extreme weather events have not demonstrably increased relative to historical highs"; the models that the Endangerment Finding relied upon "may be based on inaccurate assumptions"; and "increases in $CO_2$ concentrations have substantial beneficial impacts on plant growth and agricultural productivity, and . . . this benefit has been significantly greater than previously believed." 90 Fed. Reg. at 36,307–10.

54.    Public hearings on EPA's proposed rule are scheduled for August 19 and 20, and comments are due on September 15.[38]

---

[37] Elizabeth Kolbert, *The E.P.A.'s Disastrous Plan to End the Regulation of Greenhouse Gases*, New Yorker (Aug. 4, 2025), https://perma.cc/X4RR-MXG6.
[38] *Id.* at 36,288; *Public Hearing for Reconsideration of 2009 Endangerment Finding and Greenhouse Gas Vehicle Standards*, 90 Fed. Reg. 36125 (Aug. 1, 2025).

***The Federal Advisory Committee Act's Requirements***

55.     When a federal agency establishes an advisory committee like the Climate Working Group, the agency must comply with the requirements of the Federal Advisory Committee Act (FACA).

56.     Congress enacted FACA in 1972 in response to concerns that federal advisory committees were neither transparent nor accountable to the American people. *See* Meghan M. Stuessy & Kathleen E. Marchsteiner, Cong. Research Serv., R47984, *The Federal Advisory Committee Act (FACA): Overview and Considerations for Congress* 1 (2024). Specifically, "[t]he lack of public scrutiny of the activities of advisory committees was found to pose the danger that subjective influence not in the public interest could be exerted on . . . Federal decisionmakers." *Id.* (quoting Senate Comm. on Gov't Operations, *The Federal Advisory Committee Act*, report to accompany S. 3529, 92nd Cong., 2nd sess., September 7, 1972, S. Rept. 92-1098 (1972)).

57.     Congress accordingly passed FACA to enhance "the public accountability of advisory committees established by the Executive Branch." *Pub. Citizen v. DOJ*, 491 U.S. 440, 459 (1989). Congress formally found and declared, among other things, that "new advisory committees should be established only when they are determined to be essential and their number should be kept to the minimum necessary," "standards and uniform procedures should govern the establishment, operation, administration, and duration of advisory committees," and "Congress and the public should be kept informed with respect to the number, purpose, membership, activities, and cost of advisory committees." 5 U.S.C. §§ 1002(b)(2), (4), (5).

58.     Congress also sought to "ensure that persons or groups directly affected by the work of a particular advisory committee would have some representation on the committee." *Nat'l Anti-Hunger Coal. v. Exec. Comm. of President's Priv. Sector Surv. on Cost Control*, 711

F.2d 1071, 1074 n.2 (D.C. Cir. 1983). Congress was particularly concerned that "special interest groups may use their membership on [advisory committees] to promote their private concerns," citing as an example an Industrial Waste Committee where "[n]o representatives of conservation, environment, clean water, consumer, or other public interest groups were present." H.R. Rep. No. 92-1017, at 6 (1972), *as reprinted in* 1972 U.S.C.C.A.N. 3491, 3496.

59.    To achieve its goals, FACA imposes a number of requirements on the establishment, operations, and use of federal advisory committees. FACA broadly defines an "advisory committee" as any "committee, board, commission, council, conference, panel, task force, or other similar group . . . established or utilized to obtain advice or recommendations for the President or one or more agencies or officers of the Federal Government and that is . . . established or utilized by one or more agencies." 5 U.S.C. §§ 1001(2)(A)(iii), 1003(a).

60.    FACA's implementing regulations require that, before forming a new advisory committee, an agency head must first consult with the General Service Administration's Committee Management Secretariat (the "Secretariat"). 41 C.F.R. § 102-3.60(a). As part of this consultation, agency heads "should provide the Secretariat with a full understanding of the background and purpose behind the advisory committee." *Id.* The agency head "must" provide an explanation as to "why the advisory committee is essential to the conduct of agency business and in the public interest" and "why the advisory committee's functions cannot be performed by the agency, another existing committee, or other means such as a public hearing." *Id.* § 102-3.60(b)(1)-(2).

61.    Once the Secretariat completes its review, the agency then "must" publish a notice in the Federal Register announcing that the advisory committee is being established. *Id.*

§ 102-3.65(a). The notice "must describe the nature and purpose of the advisory committee and affirm that the advisory committee is necessary and in the public interest." *Id.*

62.    Every advisory committee must also have a charter. 5 U.S.C. § 1008(c)(1). The committee "shall not meet or take any action until [the] advisory committee charter has been filed" with "the head of the agency to whom the advisory committee reports; and . . . the standing committees of the Senate and House of Representatives having legislative jurisdiction over the agency to which the advisory committee reports." *Id.*; *see also* 41 C.F.R. § 102-3.70. The charter "shall contain," among other information, "the committee's official designation," the committee's "objectives and the scope of its activity," a "description of the duties for which the committee is responsible," and "the estimated number and frequency of committee meetings." 5 U.S.C. § 1008(c)(2); *see also* 41 C.F.R. § 102-3.75. The charter is then uploaded to a FACA database and can be accessed and downloaded from www.facadatabase.gov.

63.    Agency heads must also designate an officer "to chair or attend each meeting of [the] advisory committee," and the committee "shall not conduct any meeting in the absence of that designated officer or employee of the Federal Government." 5 U.S.C. § 1009(e); *see also* 41 C.F.R. § 102-3.120.

64.    FACA also imposes procedural and substantive requirements for selecting the members of an advisory committee.

65.    Substantively, committee membership must be "fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee." 5 U.S.C. § 1004(b)(2).

66.    The agency forming an advisory committee also must make "appropriate provisions to assure that the advice and recommendations of the advisory committee will not be

inappropriately influenced by the appointing authority or by any special interest, but will instead be the result of the advisory committee's independent judgment." *Id.* § 1004(b)(3).

67.     Agencies must follow myriad procedural steps in furtherance of these substantive requirements, including to provide GSA a "Membership Balance Plan" describing how the agency will "attain fairly balanced membership, as appropriate based on the nature and functions of the advisory committee." 41 C.F.R. § 102-3.60(b)(3). The plan "must be uploaded to the FACA database when the agency files the Federal advisory committee charter with [GSA]." *Id.* The plan "shall describe the agency's conclusions regarding the points of view that would promote fairly balanced committee membership," and "shall describe the agency's intended selection criteria and approach." *Id.* § 102-3.60(b)(3)(i).

68.     Once the agency "identifie[s] the points of view that would promote a fairly balanced advisory committee membership," agencies must "conduct broad outreach, using a variety of means and methods, to ensure that the call for nominees reaches the interested parties and stakeholder groups likely to possess those points of view." *Id.* § 103.360(b)(3)(ii). The membership balance plan "shall describe the agency's intended outreach efforts to accomplish these goals." *Id.*

69.     DOE's own manual on advisory committees emphasizes these requirements. *See* DOE, Advisory Committee Management Program Manual ("DOE Manual") at 20 (2007), https://perma.cc/FVE9-BZ9D. The manual requires that the proposal package for a new advisory committee include an "Action Memorandum" addressed to the Secretary of Energy, which "must include," among other things, "[a] description of the plan for ensuring a fairly balanced committee membership in terms of the viewpoints represented and the functions to be performed." *Id.* at 20. Proposal packages for advisory committee appointments must likewise

include "a matrix/table presenting the members' attributes (e.g., geographic location; residential, or commercial consumer) to demonstrate that balance criteria have been met." *Id.* at 40. To ensure balanced membership, "[c]onsideration will also be given to factors such as the geographic region of the country; minority groups; women's organizations; public and private academic institutions, including Black colleges and universities; physically challenged individuals and groups; and the public at large." *Id.* at 37.

70.     Once a committee is established and begins its work, FACA imposes significant transparency requirements on the committee's operations.

71.     With limited exceptions, all "meetings" of the advisory committee members must be open to the public. 5 U.S.C. § 1009(a); 41 C.F.R. § 102-3.150(a). FACA's implementing regulations broadly define a "meeting" as "any gathering of advisory committee members (whether in person or electronically, such as using telecommunications or through a virtual platform), held with the approval of an agency, and with a Designated Federal Officer in attendance, for the purpose of deliberating on the matters upon which the advisory committee provides advice or recommendations." 41 C.F.R. § 102-3.25.

72.     All meetings must be timely noticed in the Federal Register, at least fifteen days before the meeting is to be held. 5 U.S.C. § 1009(a); 41 C.F.R. § 102-3.150(a).

73.     Interested members of the public must also "be permitted to attend, appear before, or file statements with any advisory committee," subject only to "such reasonable rules or regulations as the Administrator [of General Services] may prescribe." 5 U.S.C. § 1009(a)(3). Each advisory committee meeting must be "held at a reasonable time and in a manner or place reasonably accessible to the public," and in a place sufficient to accommodate "a reasonable number of interested members of the public." 41 C.F.R. § 102-3.140(a)(1)-(2). And if an

advisory committee meeting is conducted through an "electronic medium," such as teleconference or videoconference, it still must be accessible to the public. *Id.* § 102-3.140(a)(5).

74.     FACA imposes open records requirements as well. Section 10(b) of FACA provides that "the records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by each advisory committee shall be available for public inspection and copying at a single location in the offices of the advisory committee or the agency to which the advisory committee reports," subject only to FOIA's disclosure exceptions (except advisory committees may not invoke the deliberative process privilege to shield FACA records). 5 U.S.C. § 1009(b); *see Heartwood, Inc. v. U.S. Forest Serv.*, 431 F. Supp. 2d 28, 36 (D.D.C. 2006).

75.     FACA also requires that "[d]etailed minutes of each meeting of each advisory committee shall be kept and shall contain a record of the persons present, a complete and accurate description of matters discussed and conclusions reached, and copies of all reports received, issued, or approved by the advisory committee." *Id.* § 1009(c). Transcripts of advisory committee meetings "shall" be made available to the public. *Id.* § 1010(b).

76.     Federal agencies must proactively make available all records and materials subject to disclosure; members of the public need not submit a records request as would be needed under FOIA. *Food Chem. News v. HHS*, 980 F.2d 1468, 1469 (D.C. Cir. 1992). Thus, "agencies may not require members of the public or other interested parties to use FOIA procedures in order to obtain records available under sec. 10(b) of the Act." 41 C.F.R. § 102-3.170. The regulations further confirm that "Section 10(b) of the Act . . . provides for the *contemporaneous* availability of advisory committee records." *Id.* (emphasis added).

77.    "Official records generated by or for an advisory committee must be retained for the duration of the advisory committee. Upon termination of the advisory committee, the records must be processed in accordance with the Federal Records Act." 41 C.F.R. § 102-3.175(e).

***Members of Advisory Committees Are Subject to Ethical Requirements***

78.    Advisory committee members are also subject to ethics restrictions and requirements.

79.    As is typically the case across the government, for advisory committees established by DOE, "[m]embers serving as experts" rather than representatives of a group "must be appointed as SGEs," meaning special government employees. DOE Manual at II-3.

80.    Under federal law, SGEs may not "participate[] personally and substantially," including through "the rendering of advice," in any "particular matter in which, to his knowledge, he, his spouse, minor child, general partner, organization in which he is serving as officer, director, trustee, general partner or employee, or any person or organization with whom he is negotiating or has any arrangement concerning prospective employment, has a financial interest." 18 U.S.C. § 208(a). A "particular matter" includes "policy-making that is narrowly focused on the interests of such a discrete and identifiable class of persons," but "does not extend to the consideration or adoption of broad policy options that are directed to the interests of a large and diverse group of persons." 5 C.F.R. § 2635.402(b)(3).

81.    The DOE Manual likewise provides that "[a]dvisory committee members must not participate in particular matters before the committee, such as grants or contracts, that might have a direct and predictable impact on the companies, organizations, or agencies with which they are associated or in which they have a financial interest." DOE Manual IV-7.

82.    To identify and prevent conflicts of interest, "[p]rior to becoming advisory committee members," DOE requires individuals to "disclose in writing (by annually filing either

an SF 278, Public Financial Disclosure Report, OGE 450, Confidential Financial Disclosure Report, or an alternate Executive Branch Confidential Financial Disclosure Report with the Office of the Assistant General Counsel for General Law) any financial or other interest that may be affected by the work of the committee or create the appearance of a conflict of interest." *Id.*

**Defendants Have Violated and Are Violating FACA**

83.     The Climate Working Group satisfies all of the elements of being an "advisory committee" within the meaning of FACA. DOE established the group to provide advice and recommendations to DOE and EPA, and EPA has already utilized the CWG Report in EPA's proposed reconsideration of the 2009 Endangerment Finding and vehicle regulations. The Climate Working Group has an organized structure, a fixed membership, and a specific purpose that Secretary Wright laid out in his Foreword to the CGW Report—"to critically review the current state of climate science, with a focus on how it relates to the United States." CWG Report at viii.

84.     Yet Defendants have not complied with any of FACA's procedural and substantive requirements. Secretary Wright did not consult with GSA before establishing the group. The Climate Working Group lacks a charter and a designated federal officer. Secretary Wright did not provide a Membership Balance Plan to GSA, and DOE did not conduct the outreach to different communities and stakeholders that the regulations require when selecting committee members.

85.     The Climate Working Group is not fairly balanced in terms of points of view; most glaringly, it does not include a single member that concurs in the overwhelming scientific consensus regarding the causes and effects of climate change. The group also lacks balance in terms of representing a range of disciplines, perspectives, and institutions. There are also no provisions in place to prevent inappropriate influence of the group, and the group has been

inappropriately influenced by being tasked with preparing a report that had a predetermined goal and outcome.

86.     Defendants have also violated all of FACA's transparency requirements. Defendants did not publish notice of the Climate Working Group's meetings and did not make the meetings open to the public. Defendants did not even disclose the existence of the group until releasing its reports.

87.     Defendants have not made public any of the records and other documents that the Climate Working Group must make public under Section 10(b) of FACA. Defendants likewise have not kept or made public minutes of the Climate Working Group's meetings.

88.     In short, Defendants' establishment and utilization of the Climate Working Group is wholly inconsistent with the processes, transparency, and public input that must be followed by federal advisory committees under federal law.

***Defendants' Legal Violations Harm Plaintiffs***

89.     Environmental Defense Fund and Union of Concerned Scientists have strong interests in the work of the Climate Working Group and have suffered concrete injuries from Defendants' violations of FACA. EDF is dedicated to protecting human health and the environment, and its mission is to secure a vital earth for everyone. EDF employs hundreds of scientists, economists, policy analysts, engineers, business school graduates, lawyers, and other professionals to help solve public health and environmental problems and to educate policymakers and the public on the causes and effects of climate change. The Climate and Energy Group at UCS is likewise made up of approximately seventy scientists, analysts, engineers, organizers, and advocates, working together to prevent the worst impacts of climate change. The program works on a range of related issues, including climate science, impacts, resilience, clean energy, and pushing back against disinformation on science and solutions.

90.     EDF's work critically depends on access to information regarding governmental research and actions—including assessments of the causes, harms, and solutions regarding climate change, and details of the processes and participants that contribute to such assessments. Access to this information is necessary so that EDF can understand and evaluate the information on which federal climate policy is based, and provide information from its own experts and research to help inform public policy. EDF seeks to ensure that government actions and policies are grounded in rigorous scientific findings.

91.     UCS seeks to ensure that the views of the scientific community are represented in government and has a distinct interest in ensuring that the advice given to DOE and the EPA by federal advisory committees fairly reflects the experience and expertise of UCS members and the scientific community as a whole. Further, UCS works to support the transparency and public participation elements of the federal advisory committee process as a vital form of public participation and engagement with evidence-based policymaking. UCS has long advocated for fairly balanced advisory committees, their regular meetings and adherence to their charters, and avoidance of conflicts of interest in advisory committee membership. UCS has also nominated staff and members for participation on federal advisory committees, submitted written comments, delivered oral comments, and advocated for independent science advisory bodies.

92.     UCS scientists and experts work to help ensure that the best available climate science is used to inform policies to protect communities from the impacts of climate change and limit the heat-trapping emissions driving climate change. UCS staff have contributed to the National Climate Assessments and the Intergovernmental Panel on Climate Change. UCS has a strong interest in being confident of high standards of transparency, peer review, and scientific

integrity for the credibility of climate assessment reports that federal agencies rely on for policymaking.

93.     Access to information concerning the government's assessment of climate science, and the underlying scientific information and advice upon which the government relies, is central to EDF's and UCS's missions.

94.     Plaintiffs have suffered informational injuries from Defendants' failures to file a charter for the Climate Working Group, to designate a federal officer, to provide timely notice of and public access to its meetings, and to make the group's records publicly available. Plaintiffs have a statutory right to information about the formation, operations, and decisions of the Climate Working Group, since it is an advisory committee subject to FACA, and Defendants have failed to provide this information. Plaintiffs would have attended the Climate Working Group's meetings had they been made open to the public as required, and Plaintiffs will attend the group's future meetings if open to the public. Plaintiffs would have participated in group meetings as members of the public, as provided for by FACA. Plaintiffs likewise would review the group's records that FACA requires to be disclosed.

95.     Plaintiffs intend to submit comments to DOE on the CWG Report and to EPA on its proposal to rescind the 2009 Endangerment Finding and vehicle emission standards, and to participate in the EPA public hearings on the rescindment proposal. Plaintiffs also intend to educate the public on the report and the proposed rule. Access to information about the Climate Working Group's records and meetings would significantly inform EDF's and UCS's comments and public education efforts. Lack of access to such information impedes Plaintiffs' ability to comment on the CWG Report and EPA proposal, and to inform the public about the extent of these government actions that are based on the report.

96.    Plaintiffs and UCS's members are also injured by the Climate Working Group's lack of fair balance and inappropriate influence. Defendants have denied Plaintiffs a representative voice on the group. Instead, the group's members also hold viewpoints that are contrary to the scientific consensus on climate change, and the group was given a mandate to reach a predetermined outcome. The CWG Report would have been materially different if the group had included members sharing the same viewpoint as Plaintiffs.

## CLAIMS FOR RELIEF

### COUNT ONE
**Unlawful Establishment and Utilization of a Federal Advisory Committee**
**APA Cause of Action**

97.    Plaintiffs hereby incorporate by reference the foregoing paragraphs of the Complaint as if set forth herein.

98.    Defendants' establishment and utilization of the Climate Working Group are final agency actions subject to review under the APA. 5 U.S.C. § 704.

99.    The Climate Working Group is an advisory committee within the meaning of FACA because it is a group established by DOE to obtain advice or recommendations to the federal government, and has been utilized and will continue to be utilized by DOE and EPA. 5 U.S.C. §§ 1001(2)(A)(iii). The group is not composed wholly of full-time, or permanent part-time, officers or employees of the Federal Government, and is not a committee that is created by the National Academy of Sciences or the National Academy of Public Administration. *Id.* § 1001(2)(A).

100.    The Climate Working Group has an organized structure, fixed membership, and specific purpose.

101.    Defendants DOE and Secretary Wright have failed to take the steps that FACA, its implementing regulations, and the DOE Manual require in establishing an advisory committee, including but not limited to:

a. Consulting with the Secretariat about the establishment of the Climate Working Group and providing the Secretariat with a full understanding of the background and purpose behind the advisory committee, 41 C.F.R. § 102-3.60(b)(1);

b. Providing an explanation as to "why the [Climate Working Group] is essential to the conduct of agency business and in the public interest" and "why the advisory committee's functions cannot be performed by the agency, another existing committee, or other means such as a public hearing," *id.* § 102-3.60(b)(2);

c. Publishing a notice in the Federal Register announcing the creation of the Climate Working Group as an advisory committee, *id.* § 102-3.65(a);

d. Filing a charter for the Climate Working Group, or otherwise publishing the information required for a charter under 5 U.S.C. § 1008(c)(2), *see id.* § 1008(c)(1)-(2); 41 C.F.R. § 102-3.70;

e. Designating a federal officer "to chair or attend each meeting of [the] advisory committee," 5 U.S.C. § 1009(e); *see also* 41 C.F.R. § 102–3.120;

f. Submitting a Membership Balance Plan to GSA describing DOE's "plan to attain fairly balanced membership," which "shall describe the agency's conclusions regarding the points of view that would promote fairly balanced

committee membership" and "shall describe the agency's intended outreach

efforts to accomplish these goals," 41 C.F.R. § 102-3.60(b)(3);

g.  "Conduct[ing] broad outreach, using a variety of means and methods, to

ensure that the call for nominees reaches the interested parties and stakeholder

groups likely to possess [the] points of view" that would promote fairly

balanced membership, *id.* § 102-3.60(b)(3)(ii);

h.  Giving consideration in choosing members "to factors such as the geographic

region of the country; minority groups; women's organizations; public and

private academic institutions, including Black colleges and universities;

physically challenged individuals and groups; and the public at large," DOE

Manual at 37;

i.  Making appropriate provisions "to assure that the advice and

recommendations of the advisory committee will not be inappropriately

influenced by the appointing authority or by any special interest, but will

instead be the result of the advisory committee's independent judgment," 5

U.S.C. § 1004(b)(3);

j.  Designating "an Advisory Committee Management Officer" within DOE

"who shall exercise control and supervision over the establishment,

procedures, and accomplishments of" the Climate Working Group, 5 U.S.C. §

1007(b)(1).

102.    Each "action" that the Climate Working Group took—including drafting and

releasing the CWG report—violates FACA because "[a]n advisory committee shall not . . . take

any action until an advisory committee charter has been filed . . . with (i) the head of the agency

to whom the advisory committee reports, and (ii) the standing committees of the Senate and the House of Representatives having legislative jurisdiction over the agency to which the advisory committee reports." 5 U.S.C. § 1008(c).

103.    Defendants' actions utilizing the Climate Working Group, including DOE's publishing the CWG Report and EPA's reliance on and citations to the CWG Report in its proposed rule, are unlawful because Defendants failed to comply with the requirements for utilizing an advisory committee, including but not limited to the requirements listed above and in the subsequent counts.

104.    Defendants' actions in establishing and utilizing the Climate Working Group are arbitrary, capricious, not in accordance with law, in excess of statutory jurisdiction, authority, or limitations, and without observance of procedure required by law. 5 U.S.C. §§ 706(2)(A), (C), (D). In addition or in the alternative, Defendants have unlawfully withheld or unreasonably delayed agency actions under 5 U.S.C. § 706(1).

**COUNT TWO**
**Failure to Comply with Meeting Requirements**
**APA Cause of Action**

105.    Plaintiffs hereby incorporate by reference the foregoing paragraphs of the Complaint as if set forth herein.

106.    Defendants' planning and holding of Climate Working Group meetings, and instructing and permitting the group to plan and hold meetings, are final agency actions subject to review under the APA. 5 U.S.C. § 704.

107.    Defendants have failed to comply with the requirements for advisory committee meetings.

108.    Defendants have violated FACA's prohibition that "[a]n advisory committee shall not meet . . . until an advisory committee charter has been filed" with the heads of the agencies to

which the advisory committee reports and with the standing committees of Congress having jurisdiction over those agencies. 5 U.S.C. § 1008(c).

109.    Defendants have violated other requirements for advisory committee meetings, including but not limited to the requirements that meetings be:

    a.  Open to the public. 5 U.S.C. § 1009(a); 41 C.F.R. § 102-3.150(a).

    b.  Noticed in the Federal Register at least fifteen days before the meeting. 5 U.S.C. § 1009(a); 41 C.F.R. § 102-3.150(a).

    c.  Accessible for the public "to attend, appear before, or file statements." 5 U.S.C. § 1009(a)(3).

    d.  "[H]eld at a reasonable time and in a manner or place reasonably accessible to the public," and in a place sufficient to accommodate "a reasonable number of interested members of the public." 41 C.F.R. § 102-3.140(a)(1)-(2).

110.    Defendants' actions in planning and holding Climate Working Group meetings, and instructing and permitting the group to plan and hold meetings, are arbitrary, capricious, not in accordance with law, in excess of statutory jurisdiction, authority, or limitations, and without observance of procedure required by law. 5 U.S.C. §§ 706(2)(A), (C), (D). In addition or in the alternative, Defendants have unlawfully withheld or unreasonably delayed agency actions under 5 U.S.C. § 706(1).

**COUNT THREE**
**Failure to Comply with Records Requirements**
**APA Cause of Action**

111.    Plaintiffs hereby incorporate by reference the foregoing paragraphs of the Complaint as if set forth herein.

112.    Defendants' establishment, operation, and utilization of the Climate Working Group, without complying or ensuring compliance with FACA's records requirements, are final agency actions subject to review under the APA. 5 U.S.C. § 704.

113.    Defendants have failed to comply with FACA's records requirements.

114.    Defendants DOE and Wright have failed to "assemble and maintain the reports, records, and other papers of" the Climate Working Group, and to "carry out . . . the provisions of section 552 of this title with respect to such reports, records, and other papers." 5 U.S.C. § 1007(b)(2)-(3). Defendant Wright has failed to designate a DOE official to undertake these duties. *Id.*

115.    Defendants have failed to contemporaneously make available to the public, or ensure that there is contemporaneously available to the public, "the records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by" the Climate Working Group. 5 U.S.C. § 1009(b); 41 C.F.R. § 102-3.170.

116.    Defendants have failed to keep and publicly post, or ensure that there is kept and publicly posted, the minutes of the Climate Working Group's meetings, including "[a]n accurate description of each matter discussed" in each meeting. 5 U.S.C. § 1009(c); 41 C.F.R. § 102-3.165(b)-(c).

117.    Defendants' establishment, operation, and utilization of the Climate Working Group, without complying or ensuring compliance with FACA's records requirements, are arbitrary, capricious, not in accordance with law, in excess of statutory jurisdiction, authority, or limitations, and without observance of procedure required by law. 5 U.S.C. §§ 706(2)(A), (C),

(D). In addition or in the alternative, Defendants have unlawfully withheld or unreasonably delayed agency actions under 5 U.S.C. § 706(1).

## COUNT FOUR
### Lack of Fair Balance and Failure to Prevent Inappropriate Influence
### APA Cause of Action

118.    Plaintiffs hereby incorporate by reference the foregoing paragraphs of the Complaint as if set forth herein.

119.    FACA requires that an advisory committee be "fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee." 5 U.S.C. § 1004(b)(2).

120.    As set forth above, the members of the Climate Working Group are not fairly balanced in terms of their points of view on the issues addressed in the CWG Report. All five members hold views contrary to the overwhelming consensus of climate scientists, including on the effects of climate change and greenhouse gas emissions. None of the members represents the consensus view among climate scientists that human activities—principally through greenhouse gas emissions—have unequivocally caused global warming, that widespread and rapid changes in the atmosphere have occurred that are already affecting weather and extreme climate events throughout the globe, that climate change is a threat to human well-being and planetary health, and that deep reductions in greenhouse gas emissions would lead to a discernible slowdown in global warming that would reduce projected losses and damages for humans and ecosystems.

121.    Moreover, the Climate Working Group has been "inappropriately influenced by the appointing authority or by any special interest." 5 U.S.C. § 1004(b)(3). Secretary Wright inappropriately influenced the group by establishing the CWG and specially selecting its members with a predetermined goal to provide "balance" against the "media coverage [that]

distorts the science" of climate change.[39] Wright had a "plan" that the group write a report that "cut against the prevailing narrative that climate change is an existential threat,"[40] rather than by recruiting scientists to provide neutral and objective views on climate science.

122.    By violating FACA, Defendants have acted in a manner that is arbitrary, capricious, not in accordance with law, in excess of statutory jurisdiction, authority, or limitations, and without observance of procedure required by law. 5 U.S.C. §§ 706(2)(A), (C), (D). In addition or in the alternative, Defendants have unlawfully withheld or unreasonably delayed agency actions under 5 U.S.C. § 706(1).

## COUNT FIVE
### Nonstatutory Review and *Ultra Vires* Actions

123.    Plaintiffs hereby incorporate by reference the foregoing paragraphs of the Complaint as if set forth herein.

124.    To the extent that relief is not available against Defendants under the foregoing Counts, the Court must enjoin Defendants' *ultra vires* actions that are plainly "in excess of [Defendants'] delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *Fed. Express Corp. v. Dep't of Com.*, 39 F.4th 756, 763 (D.C. Cir. 2022). Defendants' actions are "clear departure[s]" from their "statutory mandate[s]" under FACA, and represent "blatantly lawless" agency actions. *Id.* at 764.

## COUNT SIX
### Mandamus

125.    Plaintiffs hereby incorporate by reference the foregoing paragraphs of the Complaint as if set forth herein.

---

[39] CWG Report at viii.

[40] Travis Fisher, *Why I Helped Organize the Department of Energy's Climate Report*, CATO at Liberty (Aug. 6, 2025, 10:25 AM), https://perma.cc/CQ87-WCYF.

126.    The Court has authority over "any action in the nature of mandamus to compel an officer or employee of the United States or an agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361.

127.    The Climate Working Group is clearly obligated to comply with, and to be constituted in accordance with, federal law, including FACA and its implementing regulations.

128.    The Climate Working Group is clearly not in compliance with law because it has no charter, no federal officer has been designated, it lacks fair balance, is not adequately protected from inappropriate influence, and has not complied with FACA's transparency requirements for holding meetings and maintaining and disclosing records.

129.    Plaintiffs have no adequate alternative remedy against the Climate Working Group and its members.

130.    The Climate Working Group and its members are therefore subject to mandamus.

131.    To the extent that relief is not available against Defendants other than the Climate Working Group and its members under any of the foregoing Counts, mandamus is warranted to compel such Defendants to comply with their clear legal duties under FACA and its implementing regulations.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs request that this Court

A.    Declare that the Climate Working Group is an advisory committee subject to FACA and all of its requirements;

B.    Declare unlawful the establishment and utilization of the Climate Working Group by Defendants DOE, EPA, Secretary Wright, and Administrator Zeldin;

C.      Declare that Defendants violated FACA by not complying with the requirements for holding advisory committee meetings and maintaining and disclosing advisory committee records;

D.      Declare that Defendants violated FACA because the Climate Working Group does not have a fairly balanced membership and was inappropriately influenced by the appointing authority or by any special interest;

E.      Postpone the effective date of, and vacate, the establishment of the Climate Working Group, including the selection and appointment of its members;

F.      Postpone the effective date of, and vacate, each action taken by the CWG, including the drafting and completion of the CWG Report and the transmission of the CWG Report to Defendants' DOE, EPA, Secretary Wright, and Administrator Zeldin;

G.      Postpone the effective date of, and vacate, Defendants' actions utilizing the Climate Working Group, including DOE's publishing the CWG Report and transmitting it to Defendants EPA and Administrator Zeldin, and EPA's reliance on the CWG Report in its proposed rule to rescind the Endangerment Finding and the vehicle emissions standards;

H.      Preliminarily and permanently enjoin the Climate Working Group from meeting, advising Defendants or any other federal officials or agencies, or otherwise conducting Climate Working Group business, and enjoin Defendants DOE, EPA, Secretary Wright, and Administrator Zeldin from facilitating any meetings or business of the Climate Working Group and receiving advice from the group or its members, unless and until Defendants comply with all requirements for the group to operate legally as an advisory committee;

I.      Preliminarily and permanently enjoin or compel Defendants to immediately disclose all records and minutes required to be disclosed under 5 U.S.C. §§ 1009(b)-(c), and to

produce a *Vaughn* index for any materials related to the Climate Working Group in any way that are withheld from disclosure for any reason;

J.      Preliminarily and permanently enjoin Defendants DOE, EPA, Secretary Wright, and Administrator Zeldin from relying on or citing to the CWG Report and any other recommendations, advice, or reports of the Climate Working Group, in any agency actions or proceedings;

K.      Preliminarily and permanently enjoin the current deadlines for public comments on the CWG Report and the EPA NPRM to rescind the Endangerment Finding and the vehicle emissions standards until the statutory violations described above are remedied;

L.      Preliminarily and permanently enjoin Defendants EPA and Zeldin to maintain a public comment period on the proposed rescissions of the Endangerment Finding and vehicle emissions standards for at least 45 days from the date that Defendants release all records and minutes required to be disclosed under 5 U.S.C. §§ 1009(b)-(c);

M.      Award Plaintiff costs, attorneys' fees, and other disbursements for this action;

N.      Grant any other relief this Court deems appropriate.

August 12, 2025

*/s/ Daniel F. Jacobson*
Daniel F. Jacobson (D.C. Bar 1016621)*
Lynn D. Eisenberg (D.C. Bar 1017511)*
John Robinson (D.C. Bar 1735989)*
JACOBSON LAWYERS GROUP PLLC
1629 K Street NW, Suite 300
Washington DC, 20006
(301) 823-1148
dan@jacobsonlawyersgroup.com

*Counsel for Plaintiffs Environmental Defense Fund and Union of Concerned Scientists*

Respectfully submitted,

*/s/ Megan M. Herzog*
Sean H. Donahue (D.C. Bar. 450940)*
Megan M. Herzog (BBO No. 682948)
DONAHUE, GOLDBERG & HERZOG
1008 Pennsylvania Avenue, SE
Washington, DC 20003
(202) 277-7085
sean@donahuegoldberg.com
megan@donahuegoldberg.com

*Counsel for Plaintiffs Environmental Defense Fund and Union of Concerned Scientists*

Vickie L. Patton (CO Bar 30370)*
ENVIRONMENTAL DEFENSE FUND
2060 Broadway, Suite 300
Boulder, CO 80302
(720) 837-6239
vpatton@edf.org

Erin Murphy (FL Bar 1000501)*^
ENVIRONMENTAL DEFENSE FUND
555 12th St NW, Suite 400
Washington, D.C. 20004
(202) 572-3525
emurphy@edf.org

*Counsel for Plaintiff Environmental Defense Fund*

*Pro hac vice forthcoming
^Practicing pursuant to D.C. Ct. App. Rule 49(c)(3)