**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

---

ENVIRONMENTAL DEFENSE FUND, *et al.*,

                *Plaintiffs*,

     v.

CHRISTOPHER WRIGHT, in his official capacity
as Secretary of Energy, *et al.*,

                *Defendants*.

---

Case No. 1:25-cv-12249

**ORAL ARGUMENT REQUESTED**

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION AND A STAY, OR, IN THE
ALTERNATIVE, FOR SUMMARY JUDGMENT
OR CONSOLIDATION UNDER RULE 65(A)(2)**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

BACKGROUND .................................................................................................................2

    A. The Federal Advisory Committee Act.......................................................................2

    B. The Environmental Protection Agency's 2009 Endangerment Finding .................3

    C. The Department of Energy Establishes the Climate Working Group...................4

    D. The Climate Working Group Prepares Its Report .................................................5

    E. EPA Relies on the CWG Reports for Its Proposed Rescissions ...........................7

    F. Procedural History.....................................................................................................7

ARGUMENT .......................................................................................................................8

    I. Plaintiffs Are Likely to Succeed on the Merits ........................................................8

        A. The CWG Is a Federal Advisory Committee ......................................................8

            1. The CWG Meets the Statutory Definition of an Advisory Committee ...................8

            2. The CWG Meets the Multi-Part Test Other Circuits Have Applied .....................11

        B. Defendants Violated FACA's Requirements for Establishing and Utilizing Advisory Committees..................................................................................................................12

        C. Defendants Violated FACA's Meeting Requirements ...................................13

        D. Defendants Violated FACA's Records Requirements ...................................14

        E. Defendants Violated FACA's Fair Balance and Influence Requirements.................15

    II. Absent an Injunction, Plaintiffs Will Suffer Irreparable Harm...........................16

    III. The Balance of Equities and Public Interest Merit a Preliminary Injunction..................18

    IV. The Court Should Alternatively Enter Summary Judgment ...............................18

    V. The Court Should Enter Relief Matching the Breadth of the Violations .........................18

CONCLUSION ................................................................................................................20

## TABLE OF AUTHORITIES

**Cases**

*Aguilera v. FBI*, 941 F. Supp. 144 (D.D.C. 1996)........................................................................17

*Alabama-Tombigbee Rivers Coal. v. Dep't of Interior*, 26 F.3d 1103 (11th Cir. 1994)..............21

*Am. First Legal Found. v. Cardona*, 630 F. Supp. 3d 170 (D.D.C. 2022)...................5, 11, 12, 18

*Am. Oversight v. Dep't of State*, 414 F. Supp. 3d 182 (D.D.C. 2019) ........................................17

*Ctr. for Pub. Integrity v. DOD*, 411 F. Supp. 3d 5 (D.D.C. 2019).............................................17

*Cummock v. Gore*, 180 F.3d 282 (D.C. Cir. 1999)......................................................................15

*Dunlap v. Presidential Advisory Comm'n on Election Integrity*,
    286 F. Supp. 3d 96 (D.D.C. 2017)........................................................................................19

*Elec. Privacy Info. Ctr. v. Dep't of Justice*, 416 F.Supp.2d 30 (D.D.C. 2006) ...........................17

*Food Chem. News v. Dep't of Health & Hum. Servs.*,
    980 F.2d 1468 (D.C. Cir. 1992).....................................................................................14, 15

*Hearst Stations Inc. v. Aereo, Inc.*, 977 F. Supp. 2d 32 (D. Mass. 2013) ...................................16

*Heartwood, Inc. v. U.S. Forest Serv.*, 431 F. Supp. 2d 28 (D.D.C. 2006) ...........................5, 9, 15

*Lawyers' Comm. for Civil Rights under Law v. Pres. Comm'n on Elec. Integrity*,
    No. 17-cv-01354, ECF No. 28 (D.D.C. Aug. 30, 2017)........................................................15

*NAACP Legal Def. & Educ. Fund, Inc. v. Barr*,
    496 F. Supp. 3d 116, (D.D.C. 2020)........................................................................13, 16, 20

*Nat'l Ass'n of Consumer Advocs. v. Uejio*, 521 F. Supp. 3d 130 (D. Mass. 2021)...............passim

*Nw. Ecosystem All. v. Off. of U.S. Trade Representative*,
    1999 WL 33526001 (W.D. Wash. Nov. 9, 1999)............................................................16, 18

*Nw. Env't Def. Ctr. v. U.S. Army Corps of Eng'rs*,
    2013 WL 1294647 (D. Or. Mar. 27, 2013)...........................................................................20

*Orr v. Trump*, 788 F. Supp. 3d 394 (D. Mass. 2025) ..................................................................20

*Pub. Citizen v. Nat'l Econ. Comm'n*, 703 F. Supp. 113 (D.D.C. 1989)................................17, 18

*Ross-Simons of Warwick v. Baccarat, Inc.*, 102 F.3d 12 (1st Cir. 1996) ..............................16, 21

*Shawnee Tribe v. Mnuchin*, 984 F.3d 94 (D.C. Cir. 2021)...........................................................19

*Trump v. CASA, Inc.*, 145 S. Ct. 2540 (2025) ............................................................................20

*Union of Concerned Scientists v. Wheeler*, 954 F.3d 11 (1st Cir. 2020).......................5, 2, 15, 20

*US Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC*,
    121 F.4th 339 (1st Cir. 2024)..................................................................................................8

*VoteVets Action Fund v. United States Dep't of Veterans Affs.*,

    992 F.3d 1097 (D.C. Cir. 2021) ....................................................................5, 11, 12

*W. Org. of Res. Councils v. Bernhardt*, 412 F. Supp. 3d 1227 (D. Mont. 2019) ...................13, 21

*Wash. Legal Found. v. U.S. Sent'g Comm'n*, 17 F.3d 1446 (D.C. Cir. 1994) ............................21

*Washington Post v. Dep't of Homeland Sec.*, 459 F.Supp.2d 61 (D.D.C. 2006) .........................17

## Statutes

5 U.S.C. § 202 ...............................................................................................................5, 11

5 U.S.C. § 705 .....................................................................................................................20

5 U.S.C. § 706 .....................................................................................................................20

5 U.S.C. § 1001 ..............................................................................................................9, 10

5 U.S.C. § 1004 ...............................................................................................................3, 16

5 U.S.C. § 1005 ...............................................................................................................1, 19

5 U.S.C. § 1007 ...............................................................................................................2, 13

5 U.S.C. § 1008 .........................................................................................................2,13, 14

5 U.S.C. § 1009(a) ....................................................................................................3, 14, 15

## Rules

Fed. R. Civ. P. 65(a)(2) ......................................................................................................19

## Regulations

41 C.F.R. § 102-3.60 ...................................................................................................2, 3, 13

41 C.F.R. § 102-3.65 ...................................................................................................5, 2, 13

41 C.F.R. § 102-3.70 .......................................................................................................5, 13

41 C.F.R. § 102–3.120 ........................................................................................................13

41 C.F.R. § 102-3.150 ........................................................................................................14

41 C.F.R. § 102-3.165 ........................................................................................................14

41 C.F.R. § 102-3.170 ........................................................................................................15

74 Fed. Reg. 66,496 ...............................................................................................................3

75 Fed. Reg. 25,324 ...............................................................................................................4

90 Fed. Reg. 36,125 ...............................................................................................................7

90 Fed. Reg. 36,150 ...............................................................................................................7

90 Fed. Reg. 36,288 ...............................................................................................................7

## INTRODUCTION

This case presents one of the most straightforward—and consequential—violations of the Federal Advisory Committee Act (FACA) since the law was enacted fifty-three years ago. Defendants' own words conclusively establish that the Climate Working Group (CWG) meets the statutory definition of an advisory committee. Secretary of Energy Christopher Wright has stated that he "commissioned" the group, "select[ed]" its members, and endowed it with specific purposes. Robinson Decl. Ex. A (CWG Report) at viii. The group then jointly authored a report that provides direct advice and recommendations to federal policymakers, including on the "approach . . . it is essential" to take, the "realistic assumptions" that "it will be important to make," and the factors that "must be weighed" in setting climate policy. *Id.* at 130. The group's members are not full-time or permanent part-time federal employees. The CWG is clearly an advisory committee.

Once that is established, there is no dispute that Defendants violated *all* of FACA's requirements. They did not publicize the group's creation, did not comply with the procedural and substantive requirements for ensuring fairly balanced membership, and failed to make the group's records and meetings available to the public. The establishment of the CWG, and "any action" it has taken, is therefore unlawful. 5 U.S.C. § 1005(c)(1).

Plaintiffs file this motion to bring an immediate end to the lawless operation of and reliance on the CWG, before it is too late to repair the enormous harm being caused to Plaintiffs and their members. The relief entered must meet the brazenness of the legal violations and the impact they will cause. Plaintiffs request that the Court preliminarily enjoin, and postpone under the Administrative Procedure Act (APA), Defendants' unlawful actions in establishing, operating, and utilizing the CWG. Plaintiffs further request that the Court order Defendants to disclose all records that FACA requires to be disclosed, to cease any meetings of the CWG, and

to cease operations of the group entirely unless and until Defendants comply with the law. In the alternative, because Defendants' own words and the statutory text resolve this case, there is no materially disputed fact and the Court may enter summary judgment.

## BACKGROUND

### A.      The Federal Advisory Committee Act

"Congress enacted FACA in substantial part to provide uniform standards for the creation, operation, and management of advisory committees." *Union of Concerned Scientists v. Wheeler*, 954 F.3d 11, 16 (1st Cir. 2020) (citation omitted). FACA imposes "a statutory duty to ensure transparency and a balanced membership in forming advisory committees." *Nat'l Ass'n of Consumer Advocs. v. Uejio*, 521 F. Supp. 3d 130, 135 (D. Mass. 2021). When Congress enacted FACA, one of the principal concerns was that "special interest groups may use their membership on [advisory committees] to promote their private concerns." H.R. Rep. No. 92-1017, at 6 (1972), *as reprinted in* 1972 U.S.C.C.A.N. 3491, 3496.

FACA and its implementing regulations impose clear requirements on an agency seeking to establish an advisory committee. An agency must consult with the General Services Administration (GSA) and justify the need for the committee. 41 C.F.R. § 102-3.60(a). The agency must publish notice of a committee's establishment in the Federal Register, and must file a charter containing specific information. 5 U.S.C. § 1008(a)(2), (c); 41 C.F.R. § 102-3.65. "An advisory committee shall not meet or take any action until an advisory committee charter has been filed." 5 U.S.C. § 1008(c)(1). Agencies must also appoint a designated federal officer and an Advisory Committee Officer Manager to attend each meeting and oversee the committee's operations. *Id.* §§ 1007(b)(1), 1009(e).

FACA also imposes procedural and substantive requirements for selecting committee members. Substantively, committee membership must be "fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee." 5 U.S.C. § 1004(b)(2). The agency forming a committee also must make "appropriate provisions to assure that the advice and recommendations of the advisory committee will not be inappropriately influenced by the appointing authority or by any special interest." *Id.* § 1004(b)(3). The agency must follow specific procedural steps in furtherance of these substantive requirements, including providing GSA a "Membership Balance Plan" on how it will meet these requirements, and must "conduct broad outreach" in soliciting applicants to be members. 41 C.F.R. § 102-3.60(b)(3).

Once a committee is established and begins its work, FACA imposes significant transparency requirements on the committee's operations. With limited exceptions, all "meetings" of the advisory committee members must be open to the public. 5 U.S.C. § 1009(a). FACA imposes open records requirements as well, requiring that "the records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by each advisory committee shall be available" to the public, subject only to limited exceptions. 5 U.S.C. § 1009(b).

**B.      The Environmental Protection Agency's 2009 Endangerment Finding**

In 2009, the Environmental Protection Agency (EPA) issued the "Endangerment Finding," a determination that greenhouse gases threaten the public health and welfare of current and future generations, and with it a determination that emissions from motor vehicles and engines contribute to the greenhouse gas pollution that threatens public health and welfare. *See* 74 Fed. Reg. 66,496 (Dec. 15, 2009).

The Endangerment Finding rests on a vast body of scientific evidence and extensive public engagement. *Id.* at 66,517-18, 66,524, 66,531. EPA issued the finding following a lengthy

evaluation process that involved several rounds of public input—including over 380,000 comments, two public hearings, and an exhaustive investigation of rigorous, peer-reviewed scientific research. *Id.* at 66,500, 66,510. Since its issuance in 2009, the Endangerment Finding has provided support for various EPA actions to limit climate pollution from the largest emitters: coal- and gas-fired power plants, new passenger cars and trucks, medium and heavy-duty freight trucks and buses, and the oil and gas industry. *See, e.g.*, 75 Fed. Reg. 25,324 (May 7, 2010).

On his first day in office, the President signed an executive order directing the EPA Administrator to work with other agency heads to submit recommendations on the "legality and continuing applicability" of the Endangerment Finding. *See* Executive Order 14154, *Unleashing American Energy*, § 6(f). In March 2025, EPA Administrator Lee Zeldin announced EPA's intention to reconsider the Endangerment Finding.

According to records obtained through the Freedom of Information Act (FOIA), on February 13, 2025, Dr. Koonin—a future member of the CWG—emailed Administrator Zeldin's Chief of Staff to "offer technical assistance from me and colleagues in the review of the Endangerment Finding." Robinson Decl. Ex. L.

## C.    The Department of Energy Establishes the Climate Working Group

In March 2025, Secretary of Energy Chris Wright decided to convene a "climate working group." Robinson Decl. Ex. B (8/6/25 Fisher Blog). The group's express mandate was to issue a report that would "challenge the mainstream consensus," CWG Report at x, and "cut against the prevailing narrative that climate change is an existential threat," *see* 8/6/25 Fisher Blog. The group's existence was not publicly disclosed until July 29, 2025, the same day EPA released its notice of proposed rulemaking to rescind the Endangerment Finding.

4

Secretary Wright hand-picked the five individual members of the working group: Drs. John Christy, Judith Curry, Steven Koonin, Ross McKitrick, and Roy Spencer. All five have a history of questioning the impacts of human-caused greenhouse gas emissions on climate change, and have asserted that the costs of climate change mitigation exceed the benefits. Dilling Decl. ¶ 20; Ekwurzel Decl. ¶ 6. For example, Dr. Christy has written that he "see[s] neither the developing catastrophe nor the smoking gun proving that human activity is to blame for most of the warming we see," a view that he acknowledged was out of step with a "majority" of his climate scientist colleagues. Robinson Decl. Ex. C (Christy Op-ed). Dr. Spencer has stated that climate change is not a "crisis" and that "nothing we see in severe weather has been tied to human greenhouse gas emissions." Robinson Decl. Ex. D (Spencer Blog). The other members likewise are known for their "contrarian views on climate science that are out of step with the mainstream." Robinson Decl. Ex. E (Science Article).

It is indisputable that the Department of Energy (DOE) and Secretary Wright did not follow any of FACA's requirements in forming the CWG.

## D.    The Climate Working Group Prepares Its Report

In April 2025, the CWG began preparing its report. The group completed its work in under two months, working in secret without holding any public meetings or soliciting public input. The group submitted a draft report to Secretary Wright on May 27, 2025, and the report was contemporaneously sent to EPA. *See* 90 Fed. Reg. at 36,292.

On July 29, 2025, DOE published the CWG Report, titled *A Critical Review of Impacts of Greenhouse Gas Emissions on the U.S. Climate*. Secretary Wright wrote a foreword stating that he confirmed that he "commissioned this report" to "provide clarity and balance," because the

5

"media coverage often distorts the science" of climate change. CWG Report at viii. Although the report is labeled a draft, Wright concluded that "it faithfully reports the state of climate science today." *Id.*

The CWG Report bears DOE's official seal, but the Preface explains that there was "no editorial oversight by the Secretary, the Department of Energy, or any other government personnel." *Id.* at x. Dr. Curry stated that "each CWG author . . . approved this document on a line-by-line basis." Robinson Decl. Ex. F (Curry Blog). She added that "[t]he CWG expects to expend considerable time responding to the comments that are submitted on the draft report," and presumably "will be charged with writing a revised, more comprehensive report that responds to the external comments." *Id.*

In the CWG Report, the authors explain that DOE commissioned the report to advise the federal government on "climate science relevant for energy policymaking." CWG Report at x. Carrying out this mandate, the body of the report advises policymakers on a number of issues; for example, that the economic effects of carbon-dioxide-induced warming "are too small to justify aggressive abatement policy and that trying to 'stop' or cap global warming . . . would be worse than doing nothing." *Id.* at 116. The report's "Concluding thoughts" provides direct advice and recommendations to federal policymakers, including on the type of "approach for informing climate policy" that should be taken, the factors that "must be weighed" in setting policy, why "it is important" to make certain "realistic assumptions," and that "it is essential" for policymakers to "acknowledge[] both the potential risks and benefits of $CO_2$." *Id.* at 130.

Climate scientists immediately denounced the report and objected that it mischaracterized their research, including UCS board member Ben Santer, who stated that the report "fundamentally misrepresents" his work. Robinson Decl. Ex. G.

On August 1, 2025, DOE published a "Notice of Availability" of the report and has allowed members of the public only thirty-two days to provide comments. 90 Fed. Reg. 36,150. The comment period will close on September 2, 2025. *Id.*

**E.    EPA Relies on the CWG Reports for Its Proposed Rescissions**

On July 29, 2025, EPA issued a notice of proposed rulemaking to rescind the Endangerment Finding and all light-, medium-, and heavy-duty vehicle and engine greenhouse gas emission standards. *See* 90 Fed. Reg. 36,288 (Aug. 1, 2025). In the preamble, EPA states that it "reviewed and relied upon" the CWG Report "in formulating" its proposal. *See* 90 Fed. Reg. at 36,292. The proposed rule further states that the EPA Administrator personally "received and evaluated the draft report submitted by the [CWG]." *Id.*

EPA relies on the CWG Report extensively throughout the proposed rule, citing it 22 times. EPA relies upon the report for each of the central assertions in EPA's "Climate Science Discussion," including that: "reducing GHG emissions from all vehicles and engines in the United States to zero would not have a scientifically measurable impact on GHG emission concentrations or global warming potential"; "extreme weather events have not demonstrably increased relative to historical highs"; the models that the Endangerment Finding relied upon "may be based on inaccurate assumptions"; and "increases in $CO_2$ concentrations have substantial beneficial impacts on plant growth and agricultural productivity, and . . . this benefit has been significantly greater than previously believed." 90 Fed. Reg. at 36,307–10. Public hearings on EPA's proposal are scheduled for August 19, 20, and 21, and comments are due on September 22. *See* EPA, *Extension of Public Comment Period*, https://perma.cc/3HSS-Z7QK.

**F.    Procedural History**

Plaintiffs Environmental Defense Fund (EDF) and Union of Concerned Scientists (UCS) filed a complaint in this action on August 12, 2025. EDF is a nonprofit membership organization

dedicated to protecting human health and the environment. Dilling Decl. ¶ 3. UCS represents the interests of the scientific community in public policy and advocates for the role of scientists in federal policymaking. Ekwurzel Decl.  ¶ 3 Plaintiffs and their members have strong interests in the work of the CWG, and they intend to submit comments on the CWG Report and EPA's proposed rescission of the Endangerment Finding. Dilling Decl. ¶ 22-27; Ekwurzel Decl. ¶ 6; Brock Decl. ¶ 8-10. Plaintiffs now move for a preliminary injunction and stay, or, in the alternative for summary judgment.

**ARGUMENT**

In evaluating a request for preliminary relief, the "district court must consider the movant's likelihood of success on the merits; whether and to what extent the movant will suffer irreparable harm in the absence of preliminary injunctive relief; the balance of relative hardships . . . ; and . . . the public interest." *US Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC*, 121 F.4th 339, 347 (1st Cir. 2024) (cleaned up).  All of these factors favor Plaintiffs here.

**I.    Plaintiffs Are Likely to Succeed on the Merits**

Plaintiffs are likely to succeed on the merits because the CWG is a federal advisory committee, and Defendants did not comply with FACA's requirements for such committees.

**A.  The CWG Is a Federal Advisory Committee**

**1.   The CWG Meets the Statutory Definition of an Advisory Committee**

The CWG meets the statutory criteria for being an "advisory committee." The CWG is a "group . . . established or utilized to obtain advice or recommendations for . . .  or one or more agencies or officers of the Federal Government," was "established or utilized by one or more agencies," and is not "composed wholly of full-time, or permanent part-time, officers or employees of the Federal Government." 5 U.S.C. § 1001(2).

8

First, DOE "established" the CWG. Secretary Wright made this clear in the Foreword to the CWG Report, writing: "I commissioned this report." CWG Report at viii. He added: "I asked a diverse team of independent experts to critically review the current state of climate science, with a focus on how it relates to the United States." CWG Report at viii. CWG member Roy Spencer confirmed that Wright personally called and asked him to participate, and that Wright "had on his list" other eventual members of the group. Robinson Decl. Ex. D (Spencer Blog). Member Judith Curry also confirmed that Wright personally invited her to join. *Id.* Ex. H (StorrowArticle). Wright not only "chose" the CWG's members, CWG Report at viii, but also recruited Travis Fisher from the Cato Institute to come to DOE on a detail to "organize" the group and "coordinate" its activities. *Id.* Ex. I (Fisher LinkedIn). By commissioning the group, picking its members, assigning it a core task, and organizing and coordinating its activities, DOE clearly "established" the CWG.[1] *See Heartwood, Inc. v. U.S. Forest Serv.*, 431 F. Supp. 2d 28 (D.D.C. 2006).

Second, the CWG was "established or utilized to obtain advice or recommendations for" DOE and EPA. Secretary Wright stated in the Foreword that he assembled the CWG to advise him and other policymakers on "the current state of climate science, with a focus on how it relates to the United States." CWG Report at viii. The CWG members likewise understood that the report would advise the federal government on "climate science relevant to energy policymaking." *Id.* at ix. Carrying out this mandate, the CWG Report is replete with advice and recommendations for federal policymakers. For example, on specific modeling issues, the report recommends that agencies, "account for the uncertainty" in the Equilibrium Climate Sensitivity

---

[1] It suffices that DOE clearly established the CWG, but DOE and EPA also "utilized" the CWG in assigning it a specific task and managing its work, which DOE and EPA intended to use and did use for official purposes, including to justify the Endangerment Finding rescission.

when "policy making," advises that data from the Atlantic basin "is most relevant to U.S. policymakers," and suggests that estimates of the Social Cost of Carbon are "too variable to be useful for policymakers." *Id.* at 25, 48, 125. The report also contains broader advice, including that the economic effects of carbon-dioxide induced warming "are too small to justify aggressive abatement policy and . . . trying to 'stop' or cap global warming even at levels well above the Paris target would be worse than doing nothing." *Id.* at 116.

The "Concluding thoughts" to the CWG Report then provide direct advice and recommendations to agencies on climate regulations and policymaking. It states:

> This report supports a more nuanced and evidence-based approach for informing climate policy that explicitly acknowledges uncertainties. The risks and benefits of a climate changing under both natural and human influences must be weighed against the costs, efficacy, and collateral impacts of any "climate action", considering the nation's need for reliable and affordable energy with minimal local pollution. . . . An approach that acknowledges both the potential risks and benefits of $CO_2$, rather than relying on flawed models and extreme scenarios, is essential for informed and effective decision-making.

*Id.* at 130. This passage leaves no doubt that the CWG provided "advice or recommendations for . . . one or more agencies or officers of the Federal Government." 5 U.S.C. § 1001(2)(A).

Finally, the CWG is not "composed wholly of full-time, or permanent part-time, officers or employees of the Federal Government." 5 U.S.C. § 1001(2)(B)(i). There is no indication that any of the five committee members held a position with the federal government at the time the CWG began its work. And there is no indication that Drs. Curry or McKitrick have held any position or title within the federal government since the CWG Report was convened, which alone means this FACA exception could not apply.

As for the other members, it was reported in July that Drs. Koonin, Christy, and Spencer were listed in DOE's internal registry as a "special government employee," an "expert," and a "consultant," respectively. Robinson Decl. Exs. J (E&E Article); K (CNN Article). But none of

those positions are "full-time" or "permanent part-time" positions. By law, "experts and consultants" are "procured by contract" for "temporary (not in excess of 1 year) or intermittent services," and their hiring and pay are not governed by the provisions applicable to federal employees. 5 U.S.C. § 202. Special government employees must end their roles once they have worked for 135 days. 18 U.S.C. § 202. Indeed, by default at DOE and across the government, advisory committee members serve as special government employees, because that is not a full-time or permanent part-time role. Robinson Decl. Ex. M at II-III (DOE, Advisory Committee Management Program Manual); Office of Government Ethics, Memorandum to Designated Agency Ethics Officials (July 19, 2004).

### 2.  The CWG Meets the Multi-Part Test Other Circuits Have Applied

Some courts outside of this Circuit have applied a separate multi-part test for determining whether a group qualifies as an advisory committee. That test asks whether an advisory group has, "in large measure, an organized structure, a fixed membership, and a specific purpose." *VoteVets Action Fund v. U.S. Dep't of Veterans Affs.*, 992 F.3d 1097 (D.C. Cir. 2021) (quotations omitted). Some courts have added a fourth requirement that "the group must also render advice or recommendations, *as a group*, and not as a collection of individuals." *Am. First Legal Found. v. Cardona*, 630 F. Supp. 3d 170, 177 (D.D.C. 2022) (quotations omitted). This Court is not bound to apply that test. But regardless, the CWG meets all of those criteria as well.

The CWG has an organized structure. "The 'organized structure' requirement is not a high bar to clear." *Cardona*, 630 F. Supp. 3d at 181. In *VoteVets*, the D.C. Circuit found this requirement met for three individuals advising the Department of Veterans Affairs, even where they had no formal name and the agency did not organize them as a discrete group, where the individuals referred to themselves as a "unit" or a "team." 992 F.3d at 1105. Here, by contrast, DOE "assembled" the members into a group, gave the group the official name of the "Climate

11

Working Group," and tasked it with writing a report on specific topics by a specific deadline of May 28. CWG Report at x. The group thus had an organized structure.

The group has a "fixed membership": the CWG is and has always been composed of Drs. Christy, Curry, Koonin, McKitrick, and Spencer.

The group has a specific purpose. In the group's own words, its task was "to write a report on issues in climate science relevant for energy policymaking, including evidence and perspectives that challenge the mainstream consensus," CWG Report at x, or, as Secretary Wright put it, "to critically review the current state of climate science, with a focus on how it relates to the United States." *Id.* at viii. "The 'specific purpose' requirement, like the 'organized structure' requirement, is not a high bar to clear," and the CWG's assigned charge easily clears it. *Cardona*, 630 F. Supp. 3d at 183; *see also VoteVets*, 992 F.3d at 1105.

Finally, the CWG rendered its advice "as a group." *Cardona*, 630 F. Supp. 3d at 177. The "Climate Working Group" is the listed author of the CWG Report, and the authors refer to themselves in the Preface as "[t]he writing team." CWG Report iii, x. No portion is attributed to individual members; every section represents the group's collective product.

### B.    Defendants Violated FACA's Requirements for Establishing and Utilizing Advisory Committees

Because Defendants did not comply with any of FACA's requirements, the merits of this case should be uncontested if the Court concludes that the CWG is as an advisory committee.

To name just some of FACA's requirements that Defendants did not follow for establishing and utilizing an advisory committee, DOE did not:

- Consult with GSA and provide an explanation on why the group was "essential to the conduct of agency business and in the public interest" and why its "functions cannot be performed by the agency," 41 C.F.R. §§ 102-3.60(b)(1)-(2);

- Publish a notice in the Federal Register announcing the CWG, *id.* § 102-3.65(a);

- File a charter for the CWG containing certain required information, 5 U.S.C. § 1008(c)(2), *see id.* § 1008(c)(1)-(2); 41 C.F.R. § 102-3.70;

- Designate a federal officer "to chair or attend each meeting of [the] advisory committee," 5 U.S.C. § 1009(e); *see also* 41 C.F.R. § 102–3.120;

- Submit a Membership Balance Plan to GSA describing DOE's "plan to attain fairly balanced membership," 41 C.F.R. § 102-3.60(b)(3);

- "Conduct broad outreach, using a variety of means and methods," to "the interested parties and stakeholder groups likely to possess [the] points of view" needed for fairly balanced membership, *id.* § 102-3.60(b)(3)(ii); or

- Designate "an Advisory Committee Management Officer" within DOE "who shall exercise control and supervision over the establishment, procedures, and accomplishments of" the Climate Working Group, 5 U.S.C. § 1007(b)(1).

Each of these violations is actionable and warrants relief. *See, e.g.*, *NAACP Legal Def. & Educ. Fund, Inc. v. Barr*, 496 F. Supp. 3d 116, 143–44 (D.D.C. 2020); *W. Org. of Res. Councils v. Bernhardt*, 412 F. Supp. 3d 1227, 1236–37 (D. Mont. 2019).

The failure to file and publish a charter in particular carries significant legal consequences. Congress provided that "[a]n advisory committee shall not meet or *take any action* until an advisory committee charter has been filed . . . with (i) the head of the agency to whom the advisory committee reports, and (ii) the standing committees of the Senate and the House of Representatives having legislative jurisdiction over the agency to which the advisory committee reports." 5 U.S.C. § 1008(c) (emphasis added). Thus, every action the CWG has taken—including drafting the report, transmitting it or causing it to be transmitted to EPA, and publishing it—has been unlawful. And every future action it takes will be illegal, unless and until the group is reestablished and reconstituted in accordance with FACA's requirements.

### C.    Defendants Violated FACA's Meeting Requirements

Defendants also did not comply with FACA's open meetings requirements, which are essential to FACA's transparency aims. The CWG lacked authority to meet at all given no

13

charter was filed. 5 U.S.C. § 1008(c). That aside, Defendants failed to provide notice of meetings in the Federal Register and did not allow the public "to attend, appear before, or file statements" at the meetings. *Id.* § 1009(a)(2)-1(3); 41 C.F.R. § 102-3.150(a). Plaintiffs and the broader public had no way to know that the CWG even existed, let alone when it was meeting.

### D.    Defendants Violated FACA's Records Requirements

Defendants' violations of FACA's records requirements are equally straightforward. "[U]nder section 10(b) of FACA, an agency is generally obligated to make available for public inspection and copying *all materials* that were made available to or prepared for or by an advisory committee." *Food Chem. News v. HHS*, 980 F.2d 1468, 1469 (D.C. Cir. 1992) (emphasis added). That includes all "records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by" the committee. 5 U.S.C. § 1009(b). In addition, minutes from every committee meeting must be disclosed, which must include "[a]n accurate description of each matter discussed" in each meeting. *Id.* § 1009(c); 41 C.F.R. § 102-3.165(b)-(c).

As the agency that established the CWG, DOE must "assemble and maintain" all of these materials. 5 U.S.C. § 1007(b)(2)-(3). And Section 10(b) "affirmatively obligates [DOE] to provide access to the identified materials"—proactively—"even in the absence of a particular request." *Cummock v. Gore*, 180 F.3d 282, 289 (D.C. Cir. 1999). Agencies cannot delay this duty; they must ensure "*contemporaneous* availability of advisory committee records." 41 C.F.R. § 102-3.170. (emphasis added). And they may not withhold FACA materials based on the deliberative process privilege. *Heartwood, Inc. v. U.S. Forest Serv.*, 431 F. Supp. 2d 28, 36 (D.D.C. 2006).

Here, DOE had a duty to affirmatively disclose all CWG records falling under Section 10(b). This duty encompasses, at a minimum, all emails, draft documents, and other written

materials shared among the full group of five members. Such materials were "made available to or prepared for or by" the CWG. 5 U.S.C. § 1009(b). Defendants also must disclose any record prepared or received by a group member "if it was created or obtained with the intent to disclose it to the advisory committee." Order at 2, *Lawyers' Comm. for Civil Rights under Law v. Pres. Comm'n on Elec. Integrity*, No. 17-cv-01354, ECF No. 28 (D.D.C. Aug. 30, 2017).

### E.    Defendants Violated FACA's Fair Balance and Influence Requirements

FACA "requires [an agency] to maintain a fair balance on its committees and to avoid inappropriate influences by both the appointing authority and any special interest." *Union of Concerned Scientists*, 954 F.3d at 20. These requirements are justiciable. *Id.* at 19.

There can be no question that the CWG—which was formed for the express purpose of "challeng[ing] the mainstream consensus" on climate science, CWG Report at x—violates FACA's fair balance requirement. Most glaringly, it does not include a single member that concurs in the overwhelming scientific consensus regarding the causes and effects of climate change. The group also lacks balance in terms of representing a range of disciplines and perspectives. DOE's "deliberate and explicit effort to avoid the representation of any competing viewpoints on the subject matter of [the] advisory committee" is unlawful. *NAACP*, 496 F. Supp. 3d at 143-44 (holding that advisory committee on improving law enforcement lacked fair balance because all of its members were from "law enforcement," and there were no members from civil rights groups, defense attorneys, or academics); *see also Nw. Ecosystem All. v. Off. of U.S. Trade Representative*, 1999 WL 33526001, at *7-8 (W.D. Wash. Nov. 9, 1999) (holding that forest products advisory committees lacked fair balance because they consisted entirely of industry representatives without any environmental representatives).

DOE also violated FACA by failing to implement "appropriate provisions to assure that the advice and recommendations of the advisory committee will not be inappropriately influenced by the appointing authority or by any special interest." 5 U.S.C. § 1004(b)(3). DOE put no provisions in place to prevent inappropriate influence on the group, and Secretary Wright inappropriately influenced the group by specially tasking it with a predetermined goal to provide "balance" against the "media coverage [that] distorts the science" of climate change. CWG Report at viii. While there may be cases where a lack of fair balance or inappropriate influence are difficult to determine, "certainly this is not such a case." *NAACP*, 496 F. Supp. 3d at 144.

## II.    Absent an Injunction, Plaintiffs Will Suffer Irreparable Harm

Plaintiffs are suffering several types of irreparable harm. Plaintiffs and their members urgently need access to the CWG records to inform Plaintiffs' comments on the CWG Report (due September 2) and the proposed rescissions of the Endangerment Finding and emissions regulations (due September 22). Dilling Decl. ¶¶ 22-27; Ekwurzel Decl. ¶ 6-7; Brock Decl. ¶¶ 8-10; *see Nat'l Ass'n of Consumer Advocs. v. Uejio*, 521 F. Supp. 3d 130, 142-43 (D. Mass. 2021). Plaintiffs also require this information to inform the public and advocate on behalf of their members on an "ongoing proceeding[] of national importance." *Ctr. for Pub. Integrity v. DOD*, 411 F. Supp. 3d 5, 12 (D.D.C. 2019); *see* Dilling Decl. ¶¶ 12, 26-27. Courts have repeatedly held that the withholding of information in such contexts results in irreparable harm. *See, e.g.*, *id.*; *Am. Oversight v. Dep't of State*, 414 F. Supp. 3d 182, 186-87 (D.D.C. 2019) (finding irreparable harm where requested information related to ongoing impeachment proceedings); *Washington Post v. Dep't of Homeland Sec.*, 459 F. Supp. 2d 61, 75 (D.D.C. 2006) (same where information requested related to "current national debate").

Plaintiffs will also be irreparably harmed if the CWG keeps meeting without complying with FACA's open meetings requirements. Dr. Curry has stated that the CWG will keep working to respond to public comments, Robinson Decl. Ex. F, and Plaintiffs have the right to attend and participate in those meetings. If meetings continue to occur "behind closed doors," Plaintiffs "will be denied, perhaps for all time . . . that which Congress expressly protected through FACA," *i.e.*, "[t]he right to view the advisory committee's discussion of policy matters in public." *Pub. Citizen v. Nat'l Econ. Comm'n*, 703 F. Supp. 113, 129 (D.D.C. 1989).

Plaintiffs are also severely harmed by the group's lack of fair balance and Secretary Wright's inappropriate influence. It is well-established that being denied "access to a representative voice" on an advisory committee is a cognizable injury to parties "directly impacted" by the committee's work, like Plaintiffs and their members are here. *NAACP*, 496 F. Supp.3d at 128-29*; see Uejio*, 521 F. Supp. 3d at 145; *Cardona*, 630 F. Supp. 3d at 180. And given EPA's and DOE's real-time reliance on the CWG's work, Plaintiffs' inability "to influence" the committee is an injury that "cannot be remedied" after the fact. *Nw. Ecosystem All.*, 1999 WL 33526001, at *7; *see* Dilling Decl. ¶¶ 20-21, 25; Ekwurzel Decl. ¶ 6.

Finally, Plaintiffs are irreparably harmed by the CWG's illegal creation, and every action it has unlawfully taken since. The secret creation of the CWG, the stacking of its membership with persons of one point of view, and the assignment it was given to produce a report undermining the scientific consensus on climate change, all cut to the core of Plaintiffs' missions and their members' interests. *See* Dilling Decl. ¶ 20; Brock Decl. ¶¶ 4-5. Plaintiffs and their members suffer continuing injury every day that this illegally constituted advisory committee continues to exist, with every action the CWG unlawfully takes, and every time that EPA or DOE impermissibly relies on its work.

**III.    The Balance of Equities and Public Interest Merit a Preliminary Injunction**

The equities and public interest weigh decisively in favor of a preliminary injunction. FACA's purpose is to vindicate "the public['s] . . . right to know how its government is conducting the public's business." *Pub. Citizen*, 703 F. Supp. at 129. That public interest is at its peak here: the CWG may be the most consequential advisory committee ever, given the purposes for which the government is relying on it. The report is playing a key role in EPA's proposed rescission of the Endangerment Finding, providing the entire scientific basis for it.

By contrast, Defendants would not suffer cognizable harm by having to comply with their FACA obligations. "[I]gnor[ing] the strictures imposed by FACA to prevent unbalanced commissions . . . leav[es] the public to pay any concomitant price." *Dunlap v. Presidential Advisory Comm'n on Election Integrity*, 286 F. Supp. 3d 96, 111 (D.D.C. 2017). And an injunction requiring Defendants to comply with FACA before relying on the CWG Report would help prevent injury to the government, by ensuring that EPA does not devote substantial time and effort on its proposed rulemaking only to then later have its linchpin declared unlawful.

**IV.    The Court Should Alternatively Enter Summary Judgment**

The Court should alternatively enter summary judgment for Plaintiffs or consolidate the preliminary injunction with a trial on the merits under Fed. R. Civ. P. 65(a)(2). Summary judgment is appropriate here because Defendants' own words establish that the CWG qualifies as an advisory committee, and there is no dispute that Defendants did not comply with FACA.

**V.    The Court Should Enter Relief Matching the Breadth of the Violations**

Several remedies are appropriate here. First, if the Court enters summary judgment, the Court should declare that the CWG is an advisory committee subject to FACA, that Defendants' establishment and utilization of the CWG is unlawful, and that "any action" taken by the CWG is

unlawful. 5 U.S.C. § 1005(c)(1); *see Uejio*, 521 F. Supp. 3d at 144 (successful FACA plaintiffs may receive "a declaration that the Defendants' creation and administration of the [committee] violated FACA and its implementing regulations"); Order at 3, *NAACP*, No. 20-cv-01132 (D.D.C. Oct. 1, 2020) (entering such relief); *Nw. Env't Def. Ctr. v. U.S. Army Corps of Eng'rs*, 2013 WL 1294647, at *9 (D. Or. Mar. 27, 2013) (same). For Plaintiffs' APA claims against DOE and EPA, the Court should further "set aside" DOE's unlawful actions in establishing the CWG and transmitting its report to EPA, and EPA's unlawful action in utilizing the CWG report in the proposed rescission of the Endangerment Finding. 5 U.S.C. § 706(2). If the Court does not enter summary judgment, it should preliminarily provide for this APA relief, by postponing the effective date of these actions under 5 U.S.C. § 705, *see Orr v. Trump*, 788 F. Supp. 3d 394, 431-32 (D. Mass. 2025), or "preliminarily set[ting] aside" the actions under 5 U.S.C. § 706(2), *see Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2567 (2025) (Kavanaugh, J., concurring).

Second, the Court should enter a preliminary or permanent injunction, and a writ of mandamus,[2] that prohibits meetings or any other actions by the CWG until Defendants come into compliance with FACA. *See, e.g.*, Order at 2, *NAACP*, No. 20-cv-01132 (D.D.C. Oct. 1, 2020) ("[U]ntil the requirements of the [FACA] have been satisfied, . . . the Commission shall not hold further meetings . . . ."); *Uejio*, 521 F. Supp. 3d at 144 (a committee operating unlawfully may be "enjoined from meeting, advising the [government], or otherwise conduct[ing] business").

Third, to remedy Defendants' violations of FACA's open records requirements, the Court should enjoin Defendants and/or enter mandamus to make all emails, draft documents, and other records falling under Section 10(b) available to Plaintiffs and the public on a rolling basis, with

---

[2] The Court may enter relief against defendant agencies and officials under the APA, *see Union of Concerned Scientists*, 954 F.3d at 17, and based on ultra vires actions, and against all Defendants under the Mandamus Act, *see NAACP*, 496 F. Supp. 3d at 145 (issuing writ of mandamus compelling advisory committee to comply with FACA).

production to be completed within two weeks of the Court's order. The Court should specify that Defendants may not redact Section 10(b) documents pursuant to the deliberative process privilege. The Court should further require Defendants to produce a *Vaughn* index for all emails and other records that CWG members or Defendants possess that broadly relate to the CWG and Defendants do not disclose. Defendants should be "expected to err on the side of caution in creating the index" and any "document [that] was created or obtained by a [CWG] member in the course of his or her work for the [CWG] should be included in the index." Order at 2, *Lawyers' Comm*, No. 17-cv-01354, ECF No. 28. Courts have ordered a *Vaughn* index in cases involving FACA or other causes of actions seeking information outside of FOIA. *Id.*; *Wash. Legal Found. v. U.S. Sent'g Comm'n*, 17 F.3d 1446, 1452 (D.C. Cir. 1994).

Fourth, the Court should enjoin DOE, EPA, and their officials from using or relying on the unlawfully produced CWG Report. Allowing Defendants to take actions of enormous import in reliance on a patently unlawful advisory committee "would circumvent the very policy that serves as the foundation of [FACA]." *Alabama-Tombigbee Rivers Coal. v. Dep't of Interior*, 26 F.3d 1103, 1107 (11th Cir. 1994) (affirming injunction prohibiting agency from using the "product of a tainted procedure" that violated FACA). It would also "effectively render FACA a nullity." *Cal. Forestry Ass'n v. U.S. Forest Serv.*, 102 F.3d 609, 614 (D.C. Cir. 1996); *see also W. Org. of Res. Councils*, 412 F. Supp. 3d at 1242 (enjoining agency from relying on committee recommendations or work product because of FACA violation); *Uejio*, 521 F. Supp. 3d at 144 ( courts may "enjoin[] the use of a committee's recommendations").

## CONCLUSION

The Court should issue a preliminary injunction and a writ of mandamus or, alternatively, enter summary judgment in favor of Plaintiffs.

August 14, 2025

Respectfully submitted,

*/s/ Megan M. Herzog*
Sean H. Donahue (D.C. Bar. 450940)*
Megan M. Herzog (BBO No. 682948)
DONAHUE, GOLDBERG & HERZOG
1008 Pennsylvania Avenue, SE
Washington, DC 20003
(202) 277-7085
sean@donahuegoldberg.com
megan@donahuegoldberg.com

*/s/ John Robinson**
Daniel F. Jacobson (D.C. Bar 1016621)*
Lynn D. Eisenberg (D.C. Bar 1017511)*
John Robinson (D.C. Bar 1735989)*
JACOBSON LAWYERS GROUP PLLC
1629 K Street NW, Suite 300
Washington DC, 20006
(301) 823-1148
dan@jacobsonlawyersgroup.com
lynn@jacobsonlawyersgroup.com
john@jacobsonlawyersgroup.com

*Counsel for Plaintiffs Environmental
Defense Fund and Union of Concerned
Scientists*

*Counsel for Plaintiffs Environmental
Defense Fund and Union of Concerned
Scientists*

Vickie L. Patton (CO Bar 30370)*
ENVIRONMENTAL DEFENSE FUND
2060 Broadway, Suite 300
Boulder, CO 80302
(720) 837-6239
vpatton@edf.org

Erin Murphy (FL Bar 1000501)*^
ENVIRONMENTAL DEFENSE FUND
555 12th St NW, Suite 400
Washington, D.C. 20004
(202) 572-3525
emurphy@edf.org

*Counsel for Plaintiff Environmental Defense Fund*

*Admitted Pro hac vice
^Practicing pursuant to D.C. Ct. App. Rule 49(c)(3)